[No. 29432.   Department Two.   March 19, 1946.]

WILLIAM BRISTOL, *Respondent,* v. WILLIAM STREIBICH *et al.,*
*Appellants.*[1]

[1]Reported in 167 P. (2d) 125.

*Acheson, Smith & Kinney,* for appellants.

*Rummens & Griffin,* for respondent.

ROBINSON, J.—Appellants' counsel frankly state, in opening the argument in their brief: "The principal questions before the court are largely questions of fact rather than questions of law, . . ." We have found that to be the case, and it is further our opinion that the only substantial question of law presented by the appeal is raised by assignment of error No. 8, which reads as follows:

"The court erred in permitting counsel for plaintiff to ask the leading question set forth (St. 112, Line 25) over the objection of counsel for defendants."

■ In the comparatively early case of *Harris v. Halverson,* 23 Wash. 779, 786, 63 Pac. 549, this court said:

"The appellant calls attention to two leading questions, one of which was answered over his objection. *Allowing or refusing leading questions is not generally a ground for reversal, unless there appears to be a clear abuse of discretion.* We are not prepared to say there was such an abuse as to prejudice the appellant in this instance." (Italics ours.)

No authority is cited in that opinion for the rule we have italicized in the above quotation; nor has the case been cited as to that rule in any of our subsequent decisions; nor do we find any later decision in our reports which is directly in point. We have, therefore, thought it desirable to inquire as to what the rule is in other jurisdictions. We have found, in pursuing the inquiry, that the rule as set out in *Harris v. Halverson* is universally applied by other appellate courts. Under "Appeal and Error, Key No. 971 (5), Leading Ques-

tions," in the first Decennial Digest, twenty-nine decisions are cited in support of the following text:

"Allowance of a leading question is within the discretion of the trial court and cannot be reviewed."

One Texas case is cited to the contrary: *International & G. N. R. Co. v. Dalwigh,* 92 Tex. 655, 51 S. W. 500.

Under the same topic and key number, the 2d Decennial Digest cites thirty-six cases, including two from Texas, in support of the following text:

"The trial court has a large discretion as to allowing leading questions, the exercise of which will not be disturbed unless it is clearly abused."

No cases are cited to the contrary.

Under the same topic and key number, the 3d Decennial Digest cites sixteen cases supporting the same text, and again, none to the contrary.

Under the same topic and key number, in the 4th Decennial Digest, twelve cases are cited which approve the rule,. and none to the contrary.

These decisions, it will be noted, cover the whole field of American decisions from 1897 to 1936, inclusive, a period of forty years, and, out of ninety-three cases, but one is adverse to the rule stated in our opinion in *Harris v. Halverson, supra,* and even that decision has been overruled, at least *sub silentio,* by subsequent cases from the same jurisdiction.

We have examined all of the testimony given in the case, with particular reference as to whether the permitting an answer to the leading question complained of was an abuse of discretion or was in any way prejudicial to the appellants. We do not feel that the trial judge abused his discretion, and are quite unable to believe that the incident had any prejudicial effect. This cause was tried by the court without a jury, and trial judges are experienced in the evaluation of testimony. We, therefore, hold that the first assignment of error is not well taken.

The assignments of error, other than No. 8, which has hereinbefore been quoted and discussed, are as follows:

"1. The court erred in denying appellants' motion for a new trial."

We assume that this assignment has been abandoned. The appellants' brief contains no argument in support of it, and its closing prayer is solely for the dismissal of the action.

"2. The court erred in refusing to make Findings of Fact and Conclusions of Law as proposed by defendants."

In what respect the court erred, is not suggested or in any way pointed out in this assignment. This court will not assume the burden of searching through the thirteen typewritten pages of counsels' twenty-two proposed, but rejected, findings to determine whether the trial court erred in failing to include one or more of them in the findings made.

"3. The court erred in finding for the plaintiff and refusing to find for defendants."

This is a mere combination of assignments Nos. 2 and 4.

"4. The court erred in signing and filing the Findings of Fact proposed by the plaintiff."

In what respect? Here, again, the burden is put upon the court of searching through the findings to see if, perchance, it can locate some error or errors therein. It is the appellants' duty, in assigning error in the findings, to point out the portion or portions thereof which they claim to be erroneous.

"5. The court erred in finding the existence of a contract, and in finding one contrary in its terms to all the evidence of both plaintiff and defendants."

This is a sufficiently definite assignment.

"6. The court erred in finding any breach of contract by the defendants."

This is a proper assignment.

"7. The court erred in refusing to make Findings of Fact at all upon the points requested by defendants in their request for Findings of Fact."

Appellants' counsel not only submitted thirteen pages of proposed findings of fact, but filed an alternative demand, headed by the following request:

"Come now the defendants and request findings of fact upon the following matters in the event the court refuses to sign the proposed findings of fact and conclusions of law presented by the defendants herewith."

This is followed by three pages containing a schedule of twenty-three separate and distinct items on which a specific finding is demanded. Apparently, this court is expected to first check this list against the findings ultimately made, and then to determine whether it was error to fail to include any one of the twenty-three requested which does not happen to have been included therein. This, too, is a burden which the court will not assume. It is not our function or duty to search the record for errors, but only to rule as to errors specifically claimed.

■ "9. The court erred in denying defendants' motion for dismissal of the complaint with prejudice at the end of plaintiff's case."

This is a proper assignment, but clearly without merit. The court properly disposed of it in ruling as follows:

"THE COURT: The evidence shows he [the plaintiff] did turn over considerable money and he said it was for the purpose of obtaining a home in which he should live as a member of the family. That is sufficient to put you on your defense. MR. ACHESON: He has failed to prove the measure of damages. THE COURT: That, I think, is for the Court to decide. I think the Court, after hearing all the evidence, should determine what amount of damages, if any, he is entitled to. Motion denied."

The evidence at that point did show that Bristol had turned over considerable money to Streibich, and the court could have added that defendant had so admitted before the case came to trial. We quote briefly from the affirmative defense set up in his answer:

"That the plaintiff had just sold his mill and on January 15, 1937, gave to the defendants the sum of $500.00. Plaintiff was quite ill at this time and on January 17, two days later, plaintiff was confined to his bed and he called the defendant, William Streibich, in to his room and stated that he had something for the defendant. He showed to the defendant, William Streibich, a cashier's check for $1850.00

and said, *'Here, Bill, I want you to have this for all that you have done for me.'* The defendant, William Streibich, accepted the check and thanked him for it and he thereafter took and cashed the same *and has used the money for his own purposes.''* (Italics ours.)

We have left for disposition assignments Nos. 5 and 6.

The plaintiff, Bristol, was seventy-six years at the time of the trial. The theory of his action, as pleaded, appears to have been that the defendants had secured permanent possession of his money and other property by active fraud, in that the defendants, after having been given temporary possession thereof for a limited purpose, contrived to get permanent possession by making a purported contract to support him for the rest of his life, which they later repudiated by claiming that the money and other property were rightfully acquired by outright gifts.

Appellants have not only stated in their brief that the principal questions before this court are largely questions of fact, but we further find from the record that, when the trial judge, at the close of the trial, asked counsel for both parties to furnish written briefs, Mr. Acheson responded: "This is primarily a question of facts."

From the foregoing analysis, it is apparent that the questions of fact to be inquired into on appeal are: Did the defendants purport to make the contract as alleged? And, if it is found that they did: Did they refuse to perform their part of that agreement? The answer to these questions must be deduced from the three hundred sixty-six pages of oral testimony and twenty-six documents sent up as the statement of facts. While we must weigh the whole thereof in order to determine whether or not it preponderates against the court's findings that the defendants purported to make the agreement alleged and, after absorbing the consideration furnished by plaintiff, abandoned performance, it is obvious that we cannot undertake to restate it in an opinion with anything approaching completeness; nor would it serve any useful purpose to do so. We can here deal only with the high lights of the controversy.

In 1925, Bristol was operating a logging outfit at Eaton-

ville. Streibich, who had emigrated from Germany two years before, was sent to him for employment by a Tacoma agency. He was then about twenty-three years of age, and was hired by Bristol as a "flunkey," and worked for him in that capacity about three months. That operation was then discontinued. Bristol had become quite fond of Streibich, and both he and Streibich went to Seattle, where Streibich found employment as a baker. Bristol bought, and began operating, a small hardwood lumber mill. Streibich testified that for years he went to the mill after finishing his work at the bakery and worked for the plaintiff without wages or salary. That he frequently called then is admitted, but that he did any material amount of work was denied, not only by Bristol, but by three ex-employees of the mill who were called and testified on rebuttal.

In 1929, Streibich returned to Germany and was married while there. He brought his wife to Seattle, and Bristol became equally fond of her. The court found, and both parties accept the finding, that a close, confidential relationship existed between the parties, and that, in fact, the plaintiff treated the defendants as if they were his own children, and they, in turn, treated him as if he were their father.

On January 1, 1937, Bristol was stricken with a severe illness, involving acute pain and suffering. At that time, he had living quarters at the mill. Hospitalization was immediately necessary, but he returned to the mill on January 10th. He had been told, by his physician, that it would be necessary for him to have a serious operation in the near future, and that it was unlikely that he would be able to carry on his business, and he had, in fact, already begun to liquidate it.

From this point on, the parties differ radically as to what occurred. We quote the appellants' version as to the main incidents involved from the brief filed in their behalf:

"During this period of time Streibich visited Bristol at the mill frequently. Streibich knew that Bristol had accumulated considerable money in his liquidation and on January 15, five days after Bristol's return from the hos-

pital, Streibich told Bristol of his having located a home which he desired to purchase, and stated that he did not have sufficient funds to make the down payment and requested Bristol to let him have $500.00. Part of the discussion about the $500.00 was heard and testified to by Gus Schwertfeger. Bristol got up from his bed and went out into the mill where he got a glass jar in which there was a roll of bills and he gave $500.00 out of this glass jar to Streibich.

"Several days later, on January 17, 1937, Bristol was visited by Streibich as usual. During the course of the visit he handed to Streibich a cashier's check for $1850.00 and said to Streibich.

" *'Here, Bill, I want you to have this for all you have done for me.'* (St. 178)

"Streibich was very happy and pleased over the gift and he accepted it and deposited it in the Seattle-First National Bank in his own name, opening a checking account. About January 20, 1937, while Mr. Bristol was still sick in bed and Streibich was visiting him, Bristol handed Streibich another $200.00 in cash. At that time Bristol stated he did not feel so well and eventually he would have to go back to the hospital for an operation and he wanted Streibich to keep the $200.00 for him so that he would have funds immediately available with which to pay the hospital when he had the operation performed. At that time Streibich knew that Bristol was attempting to liquidate his mill holdings and he knew that he would have no particular place to go after he sold the mill, so he invited Bristol to come and stay with him and his wife. . . . At the time of the invitation to Bristol Streibich was negotiating for the purchase of the Nelson home and on March 3, 1937, he completed his negotiations and signed the earnest money receipt, paying $500.00 upon the same. On March 10, 1937, he paid an additional $500.00 upon the purchase of said property and obtained the contract of purchase. The Streibichs moved into their new home in either March or April, 1937, but Mr. Bristol did not at that time accept their invitation because he had not completed the liquidation of the mill. On April 19, 1937, Bristol sold the mill and completed the sale on May 19, 1937, although he did not complete his liquidation until November, 1937, all of which occurred after the monies above referred to were delivered by Bristol to Streibich." (Italics ours.)

Bristol's version concerning the check for $1,850 is as follows:

"Bill used to come down and sit up with me some nights while the nurse went away for a rest. I was not getting any better for about ten days and along about the 20th of January I realized I was terrible sick and the doctor had told me if I didn't do something I would not live long. I told Bill about it and we talked it over and I told Bill he was the only one I could turn to and I said 'If anything happens to me there has to be someone to tend to this business.' I told him I would give him money and he was to take it to the First National Bank and open an account in his own name and pay out money and accounts for me because I didn't know what was going to happen for me if I had to go to the hospital and he would have to do all that for me. So I turned it over to him, a cashier's check for $1850 and he went to the Bank to do this as agreed. . . ."

Streibich admits that he had gotten five hundred dollars from Bristol some days before he got the check, and further admits that he received another check for two hundred dollars from him on January 20th. About ten days after that, according to Bristol's testimony, the following occurred:

"We often talked over about my position there and he made the proposition to me about taking care of me. He said 'You cannot stay here like this,' he says. We talked it over on several occasions and then he come back again and said he had talked it over with his wife and he says 'Our house is not a big house and we will have to have a bigger house and if you will get a bigger house where we can all move in, we will take care of you and you won't have anything to worry about.' . . . That agreement was made and made by him and was his own proposition whereby he would take care of me the rest of my life. At that time I was very sick and was not supposed to live very long."

Bristol testified that some days later, he thought about February 11th, Streibich took him over to his home to give him a sitz bath. While there, according to his testimony, Mrs. Streibich was very insistent that he get out of the mill and get where they could take care of him. He testified that, before he left the Streibich home, he made an agreement with both Streibich and his wife that they would take care of him "the rest of my life."

Bristol further testified that, on February 11th, he gave Streibich one thousand dollars in cash, which he took from a glass jar which he had hidden on the mill premises, and also testified that he gave him an additional six hundred dollars early in March. There is independent evidence that Bristol was accustomed to hiding money around the mill in tin cans or glass jars. On one occasion, when he wanted to pay some money to his physician, he gave him explicit directions as to where to dig up a milk bottle containing one hundred fifty dollars. The doctor found the money at the spot indicated.

It is not disputed that Streibich took Bristol over to see the house he wanted to purchase, and subsequently did purchase. The upstairs was unfinished, and the washroom and the basement were in the same unfinished condition. On March 3, 1937, Streibich paid five hundred dollars as earnest money on the purchase of the house, and on March 10th, an additional five hundred dollars to complete the down payment. Streibich was obligated to pay twenty-five dollars per month on the contract. Bristol testifies that he told him to pay it up and save the interest. Streibich denies this, but admits that he paid $1,002.26 in June, and the balance due on the contract in August. Bristol testifies that he turned over all of his property to Streibich, according to the alleged agreement, even including his life insurance policy. Streibich testifies concerning this, as follows:

"Q. The amount of the insurance policy was what? A. The face value of the insurance policy was $2500. Q. That looked to you at the time as a pretty good investment in consideration of his condition? A. That is the way Mr. Bristol put it to me. Q. He put it to you and you thought it was, didn't you? A. I thought it was. My wife didn't think so."

This policy, however, was subsequently reassigned to Bristol.

In the meantime, Bristol was liquidating the mill property. In November, 1937, he took up his residence at Streibichs', bringing with him a number of odds and ends of material and a considerable amount of lumber from the

mill. He proceeded to finish the two upstairs rooms, and other unfinished parts of the house. He also worked in and around the garden. During most of the time that he lived with the Streibichs, he received an old age pension, at first amounting to twenty-three dollars, and finally rising to forty dollars. Bristol testifies that much of this was used for the general purposes of the household. This the Streibichs denied. He was also receiving blue stamps. These the Streibichs used to buy supplies at a cheaper than market rate, although they say they repaid Bristol their actual value.

In May, 1939, Bristol was in the hospital for a bladder operation, and on August 25, 1939, he was very seriously injured in an automobile accident. He sustained a compound fracture of the left leg, was unconscious, and, at the time of the trial, was required to use crutches, and will always be required to do so. On this occasion, he remained in the hospital twenty-eight days, and then returned to the Streibich home. Streibich testified that "the condition in my home was one of constant turmoil."

"Q. What was the trouble? A. When Mr. Bristol came back out of the hospital there was not one minute's peace in my home any more. He demanded constant attention. He was upstairs in his room and called for attention with his cane knocking against the floor. His leg was in very bad shape and he had a full cast on the leg when he was released from the hospital. . . . My wife took the brunt of the situation because on two occasions when I dressed and cleaned Mr. Bristol's wound, which was very deep and full of pus, I was overcome on two occasions and could not do it any more, so my wife stepped in and did it after that. The condition was bad and the man was suffering terribly. . . . When the cast was finally off Mr. Bristol had no bone connection in his leg and his leg would flop around like a rubber hose. The condition was bad and the man was suffering terribly."

In November, Bristol was taken back to the hospital and remained there until April 2, 1940. Dr. Godfrey removed Bristol from the hospital on that date, and drove him to Streibich's house. Streibich refused to let him enter. Concerning this incident, Streibich himself testified:

"A. I believe it was the month of March. I am not sure. Mr. Bristol appeared there in front of my house—THE COURT: What year? A. 1940, Your Honor.—with Dr. Godfrey. I came out of the house and stepped to the car and I told Mr. Bristol that he could not enter my house. I asked Dr. Godfrey to take him back to where he came from. I believe that was the extent of it."

Dr. Godfrey was successful in placing Bristol in the home of a nurse. When she refused to further care for him, the Streibichs, yielding to his pitiful pleadings, took him back on April 28th. On July 2nd, upon the advice of his physician that he must have salt water treatments, he moved to a shack on a salt water beach, leaving his personal belongings, for the most part, at Streibichs'. Shortly thereafter, the Streibichs rented, to other parties, the home they had purchased with the funds furnished by Bristol, and shortly thereafter sold it for the sum of $3,150. For something like seven months, they lived in a store building, while premises which they had purchased were being prepared for occupancy. In 1942, with the help of Streibich, who contributed twenty dollars, Bristol acquired a shack from a Japanese who was being removed to an internment camp. Streibich testified that he furnished Bristol other sums during this period, one of them being as much as one hundred dollars. Later in 1942, the parties began to quarrel over their relationship, and began making claims against each other. During this controversy, the Streibichs made it clear that they were through with Bristol.

In making the foregoing statement of the high points of the evidence, we realize that we have not discussed, and in some instances not even mentioned, many things which counsel for both parties, and particularly counsel for appellants, consider highly significant and important. The volume of the evidence is so great as to preclude any other method of treatment in an opinion kept within reasonable bounds.

On appeal, the attorneys for both parties directly admit that the questions are factual, and tacitly admit that the answers to be given thereto depend upon an exploration of

the question: Which of the two principal actors is the more worthy of belief? As to that matter, of course, the trial judge was vastly more able to judge correctly than we can possibly be, since he observed them and heard them testify for hours. It required one hundred forty pages of the statement of facts to reproduce the testimony of Bristol, and an equal number, the testimony of Streibich.

Bristol alleged that he turned over to the defendants $1,850, $200, $1,000, and $600 in cash, besides other miscellaneous property. Streibich admitted that he received the $1,850, the $200, and $500 more, which last sum Bristol handed him from a tin can. He could not have denied the receipt of these sums; for the first two of those items were delivered by check, as was provable by documentary evidence, and one of his own witnesses testified as to the delivery of the money from the can, but he did deny the receipt of anything else. The finding of the court that he received *at least* $2,550 from Bristol is, therefore, wholly unassailable.

The further finding of the court that Streibich used $2,525 of Bristol's money in purchasing the house is also clearly supported by a preponderance of the evidence. In fact, it is practically admitted. The overshadowing question in the case is: Why or on what terms, if any, did Bristol turn over this money to Streibich?

■ Since the trial judge did not hand down a memorandum opinion, we do not know what his method of approach to the decision of this case was. We will approach the problem as it confronts us by first inquiring into the position taken by the defendants with respect to the delivery of the check for $1,850 on January 17, 1937. On August 23, 1943, more than six and a half years after the delivery of the check, Streibich verified an answer in this cause describing that delivery as follows:

"He [Bristol] showed to the defendant, William Streibich, a cashier's check for $1850.00 and said, *'Here, Bill, I want you to have this for all that you have done for me.'* The defendant, William Streibich, accepted the check and thanked him for it and he thereafter took and cashed the

same and has used the money for his own purposes." (Italics ours.)

At the trial, more than seven years after the incident and six months after verifying the pleading, Streibich testified as follows:

"Q. Will you tell the Court exactly what happened at that time, what was said and done by both yourself and Mr. Bristol? A. I believe it was on Sunday evening when I dropped in as I did quite often and Mr. Bristol had retired, or had gone to bed. I came into his bedroom and after greetings he said he had something for me. *He said 'Here Bill, I want you to have this for all you have done for me.'* Then he said—Q. What did he do when he said 'Here, Bill I want you to have this for all you have done for me'? A. Well, he handed me a check for $1850. I believe it was a cashier's check, if I remember right." (Italics ours.)

At the time of the delivery of the check, Bristol was but a few weeks less than seventy years old. As admitted, he was very ill and facing a major operation. He knew he could no longer carry on his business and had already begun its liquidation. He had long before become permanently estranged from his wife. He had no children. The cashier's check for $1,850 was his principal asset. It is said, in appellants' reply brief:

"It is very obvious though, from a reading of his testimony, that Mr. Bristol was not a confused old man but a very intelligent and capable man with years of executive experience."

From reading his testimony given at the age of almost seventy-seven, we get the same impression, and it is reasonable to assume that he was intelligent seven years before when he delivered the check. It is, therefore, more than difficult for us to believe that he gave the check to Streibich as an outright gift; for, surely, no intelligent man, in the circumstances that faced Bristol, would have done such a thing. This is putting the matter very mildly. It is scarcely too much to say that, under such circumstances, no one but a fool would have so acted. The trial judge very evidently did not believe the testimony of Streibich purporting to

quote Bristol with such preciseness after a lapse of seven years; nor do we.

There must, however, have been some reason for Bristol's turning over his money and property to Streibich. Having rejected the reason advanced by Streibich as improbable, unnatural, and unbelievable, we turn to the version of Bristol.

Bristol testified that he gave Streibich the check and other sums because he thought Streibich might have need of it in liquidating his business while he was in the hospital; that he consented to his using his funds to acquire the house which Streibich wanted to buy, a house which, Streibich represented, would be large enough for a home for his family, and for Bristol also, and which, as is further admitted, he took Bristol to see and inspect. Out of the effort to acquire this house grew an agreement, first, with Streibich, and then with both Streibich and his wife, that, if he would turn over to them the rest of his property, they would take care of him the rest of his life.

In view of the circumstances shown, this version of the matter seems to us to be natural and believable. Bristol was seventy years old. It is admitted that he was desperately ill and was facing a major operation. He was under no obligation to leave anything to anyone at the close of his life. The one indispensable thing he was in need of was a home for such time as he might live. On the other hand, Streibich needed a home large enough for his expanding family. He had already picked out a suitable one, but, as he admits, he did not have enough money to make the required down payment. Under the circumstances as they then appeared, it must have seemed to him that Bristol had not very long to live. He might not even survive the operation. It would seem that, at the time, such an agreement would have appeared advantageous to both Bristol, on the one hand, and to the Streibichs, on the other. We are, therefore, unable to hold that the evidence preponderates against finding of fact No. 6. The first paragraph of that finding is based on Streibich's admissions.

The second paragraph, which deals with the most vital factual question in the case, reads as follows:

"That early in February, 1937, defendant husband found a home which he contemplated purchasing and defendants conferred with plaintiff relative thereto; thereupon, it was orally agreed between plaintiff and defendants that said defendants should use the moneys deposited by plaintiff with defendants, or so much thereof as might be necessary, to apply upon the purchase of said home and that the said defendants, in consideration of the use of said moneys, would purchase the home then in contemplation by them of purchase and would make a home for plaintiff for the rest of his natural life and would provide and care for him for the rest of his natural life."

Finding No. 7, with the exception of the assumption contained in its first line, is fully supported by admissions of Streibich made at the trial and reads as follows:

"That in accordance with said agreement the defendants did, from out plaintiff's funds, make an initial payment of $500.00 earnest money upon said home on March 3, 1937; an additional $500.00 on March 10, 1937, constituting the down payment upon said home, and did, from out plaintiff's funds aforesaid pay an additional item aggregating $1,525.00 toward the purchase of said home; that the final payment upon said home was completed October 6, 1937."

It was contended by the appellants that, during the period from August, 1937, until March, 1940, they had advanced money to or for Bristol in the amount of $1,313.11, and additional sums of which they had no record. That they did advance some of this money is certain, and, as we read the record, advancements totaling over four hundred dollars were admitted. But the evidence to prove the principal part of this claim is unsatisfactory and uncertain. On the other side of the picture, it was Bristol's claim that he had advanced $3,650 in cash, which is $1,125 more than the court found, plus chattels worth $333. To establish this claim for $1,125, there was no evidence other than Bristol's own. The state of the evidence was such that, apparently, the trial judge did not feel warranted in making specific findings supporting the not too clearly established claims of

either of the parties. Furthermore, it is apparent that, if he had found the claims of both to be good, they would have almost exactly offset each other.

We have, then, a situation where the court found, in effect, that the defendants had received $2,525 of respondent's money in exchange for promises which they subsequently refused to perform, setting up a false claim that they had received the money as an outright gift. Basing its conclusions on these established facts, the trial court concluded that, in law and justice, the respondent was entitled to reimbursement. At first sight, this disposition of the case seems to wholly disregard the fact that Bristol did live with the Streibichs and they furnished him a home for several years. But the court gave that matter due consideration. Finding of fact No. 10 reads as follows:

"That during the period of time the defendants did care for, maintain and make a home for plaintiff, the latter supplied lumber and materials and his personal labor in the repair and completion of said home premises and did work continually in and about the improvement of said home premises, and his services were of a value, as well as any moneys paid by defendants to plaintiff, to more than offset the cost of his care and maintenance."

We are unable to find that the evidence preponderates against this finding.

The judgment appealed from is affirmed.

BEALS, BLAKE, SIMPSON, and MALLERY, JJ., concur.