[No. 30609.   Department Two.   July 8, 1949.]

CHRIST COULOS *et al., Respondents*, v. PETER DESIMONE *et al., Appellants.*[1]

[1]Reported in 208 P. (2d) 105.

*Torbenson & Baum* and *Richard M. Thatcher,* for appellants.

*Christ D. Lillions,* for respondents.

ROBINSON, J.—Plaintiffs brought this action to recover damages for their alleged constructive eviction from certain property located at 8502 15th avenue N. W., in Seattle, and referred to throughout the record as the Big V Cafe. The court dismissed defendants Ruff from the action, leaving Mr. and Mrs. Desimone as sole defendants. The case was tried to a jury, which returned a verdict for plaintiffs in the sum of $7,000 general damages, and in the further sum of $250, the latter amount having been paid by plaintiffs as a lease deposit at the time of execution of the lease. Defendants Desimone moved for a new trial. The court declared it would grant the motion unless plaintiffs agreed to a reduction in their verdict to $4,800, plus $250. Plaintiffs filed their consent to the reduction, and judgment for $5,050 and costs was entered in their favor. Defendants Desimone appeal.

Mr. and Mrs. Ruff were the former owners of the real property on which the Big V Cafe was located. In 1942, they leased it to respondents Coulos and Armatas. The lease was for a term of five years, ending June 30, 1947, at the rental of $125 per month. It contained the following provision:

"This lease shall not be assigned by operation of law, or otherwise, nor any part of the premises sublet without the written consent of the lessor being first obtained in writing."

Respondents Coulos and Armatas then went into possession of the premises. On June 10, 1943, however, desiring to dispose of their business, they sold the personal property in the restaurant to Mr. and Mrs. Hoffman by contract of conditional sale, and in connection with the transaction drew up an assignment of the lease from Coulos and Armatas to the Hoffmans. The property at that time was being managed by J. A. Burkheimer, a realtor. The papers involved in this transaction were prepared in the office of his father, J. E. Burkheimer, an attorney. The elder Burkheimer testified that he prepared them, not at the request of his son, but at the request of Coulos and Armatas.

Nothing on the face of the assignment suggests that it was made in connection with a conditional sales agreement. It is signed by Coulos and Armatas as first parties and by the Hoffmans as second parties. Following their signatures is an additional clause which reads as follows:

"CONSENT TO ASSIGNMENT
"We hereby consent to the foregoing assignment and to the terms and conditions therein stated; provided, however, that no further assignment of said lease shall be made without the written consent of lessors."

This assignment was mailed to the office of the younger Burkheimer in order that the consent of the Ruffs might be obtained thereto; and their signatures appear on it following the above quoted clause. There was no evidence that the Ruffs ever saw the conditional sales agreement.

A third paper, drawn up in connection with the transaction, is one denominated "Agreement," which reads, in part, as follows: (Respondents Coulos and Armatas are, of course, the "first parties" referred to; and the Hoffmans, the "second parties.")

"(2) The first parties have executed an assignment of a lease dated June 29th, 1942, between H. A. Ruff and Grace S. Ruff, his wife, as lessors, and first parties, as lessees for the premises aforesaid, and the original lease to-

gether with the assignment and consent to assignment by the lessors, are deposited, together with copy of this agreement, at the Seattle-First National Bank, Ballard Branch.

"(3) So long as the second parties are not in default in any of the terms and conditions of said contract of conditional sale, they shall be entitled to the use and possession of the premises described in said lease, and second parties agree that they will pay the rent under said lease from and after June 1st, 1943, as provided in said lease.

"(4) Upon full and complete payment and satisfaction of all of the conditions of said contract of conditional sale, the said original lease, assignment thereof and consent to assignment shall be delivered to the second parties, which lease assignment carries with it the right to the lease deposit contained in said lease, i.e. $250.00.

"(5) In the event, however, the second parties shall default in any of the terms and conditions of said lease, said second parties agree that they will forthwith surrender possession of all of the personal property and business described in the contract of conditional sale, and will also surrender and deliver up at the same time the possession of the premises described in the lease, without any notice of action by the first parties, time being material and of the essence of this agreement."

This agreement was signed by Coulos, Armatas, and the Hoffmans. As with the contract of conditional sale, there is no evidence to indicate that the Ruffs ever saw it. Armatas took the contract, the assignment, and the agreement to the Ballard Branch of the First National Bank and there deposited them in accordance with the terms of the latter instrument.

On May 9, 1946, the Hoffmans being delinquent in payments under the conditional sales contract, Christ D. Lillions, respondents' attorney, went to the bank and took possession of the papers that had been left with it. Thereafter, respondents instituted a replevin action in the King county superior court to recover the personal property which was the subject of the conditional sales contract. Hoffman closed the restaurant and left the keys with Desimone, the owner of a neighboring establishment, for delivery to Coulos and Armatas. Armatas, accompanied by Lillions, went to Desimone, who, after inspection of the papers involved in the

conditional sales transaction, stated that he believed that Armatas was entitled to the property, and turned the keys over to Lillions. He, in turn, delivered them to the sheriff, who levied on the property and took possession of the premises. On or about June 1, 1946, Coulos and Armatas again entered into possession. Judgment in their favor was subsequently entered in the replevin action.

Meanwhile, on or about May 31st, the Ruffs sold the real property, by real-estate contract, to Mr. and Mrs. Desimone. Coulos and Armatas apparently were not informed of this transaction. On the same day, Lillions allegedly sent a letter to Ruff and the younger Burkheimer, the realtor, stating that Coulos and Armatas had repossessed the property in accordance with the terms of the agreement made with the Hoffmans, and tendering the June rent. The younger Burkheimer stated that he had not received this letter. Armatas testified that he also made a personal tender of the June rent to the younger Burkheimer, and was told by him that Desimone had purchased the property, and that he, as agent for the Ruffs, had nothing more to do with it. Burkheimer did not recall this conversation. In any event, on June 19th, Lillions sent a letter to Desimone, stating that he had been advised that the latter had purchased the property, and making another tender of the rent. On June 24th, the elder Burkheimer, who was now acting as attorney for Desimone, replied to this letter, refusing to accept the tender of rent, and stating:

"With reference to the lease dated June 29, 1942, referred to by you in your letter, in which Chris Coulos and Theo Armatus are named as lessees, this lease was assigned by Coulos and Armatus to Karl F. Hoffman and Ruth Frances Hoffman by written assignment dated June 10, 1943, and the owners in fee of the property consented in writing to the assignment of the lease, wherein it is provided that no further assignment of said lease shall be made without the written consent of the lessors. Since the date of said assignment, the rent has been paid by Hoffman and wife, who are, as far as Mr. Desimone is concerned, the tenants. Mr. Desimone has acquired the property by contract of purchase from the original fee owners. . . .

"Under the above conditions, Mr. Desimone asserts the right to determine whether he will or will not consent in writing to any assignment of this lease from any person legally entitled to assign the same, and until his consent is obtained in writing, he will not recognize any assignment of any interest therein by anyone."

On July 26th, Lillions replied to this letter, to the following effect:

"I noted carefully the contents of your letter. Under the circumstances we have no alternative than to treat the landlord's denial of our right to assign the lease, or even occupy the premises, as an eviction, and since no purpose can be served by our holding the keys to the premises I hereby deliver them to you, as attorney for both Mr. Ruff and Mr. Desimone."

Meanwhile, the acts now chiefly relied on to constitute a constructive eviction had taken place. After taking over the Big V Cafe, Coulos and Armatas put it up for sale once more by placing an advertisement in the newspaper. Prior to this, however, Desimone, accompanied by Hoffman, came to the restaurant. Coulos testified that Desimone offered him $2,000 to leave the place, and that the following occurred:

"A. And I didn't know at that time that Mr. Desimone he was the landlord. I didn't know if he was the landlord at all. So he says, 'You are going to get the $2,000 and like it.' So I say, 'Why?' He say, 'Because I am the landlord here. You talking to the landlord now.' I told him, 'I don't know you for the landlord.' So he went out — was nothing said that day. So I put it in the paper I sell it, and several people came in over there, and Mr. Desimone came in and interfere with my sales."

According to Coulos' further testimony, Desimone interfered with him on two subsequent occasions. After the advertisement was put in the paper, several prospective customers came to the restaurant, some interested in purchasing the entire establishment, some only certain of the equipment therein. While some of these prospects were in the restaurant, Desimone allegedly appeared. He told Coulos to "Take your duds and get out before I throw you out."

Then Coulos testified that he said to him, in front of the others, "What are you trying to sell? You ain't got nothing here." He further testified that, on the following day, Desimone came in again and made similar remarks in front of other prospective purchasers, causing them to leave. Coulos stated that by these actions Desimone "made it so tough for me I couldn't stay on the place." More specifically, he testified as follows:

"Q. Did you try to open and operate that place as a going business? . . . A. Yes, I tried to sell it and if I couldn't sell it I was going to open it. . . . Q. Or did you open it as a going business? A. Because Mr. Desimone kept on bothering me, and that was the trouble and I didn't open it. Q. Where was this bothering by Mr. Desimone taking place? A. Right in the place. He was coming over there and bothering me and calling me all kinds of names, and he was going to throw me out. That was the trouble. I couldn't stay any longer after that he make it tough for me; I couldn't stay any longer. Q. Was that in the hearing and in the sight of the public? A. When the public was there it was the same thing; he was talking to the public; I got nothing to do with the lease, I haven't got no lease. Q. That is what he was saying, you mean? A. Yes; he was saying to the public, yes. Q. That you had nothing to do with the lease and you had no lease? A. Yes, and I have no lease at all."

Having thus, as he alleged, been deprived of both his opportunity to sell the establishment and also of the opportunity to run it himself for the remainder of the term of the lease (in case it could not be sold), he was forced, as he alleged, to take his equipment from the restaurant, sell it at a loss, and turn his keys over to his attorney, Lillions. He did not identify any of the prospects whom he asserted Desimone's actions turned away, and Desimone denied that the incidents related by Coulos ever took place.

Appellants' fourteen assignments of error may be divided into three main groups. They contend, first, that no relationship of landlord and tenant existed between the parties at the time of the alleged constructive eviction; second, that, even if such a relationship did exist, the evidence, considered in the light most favorable to respondents, was insuffi-

cient, as a matter of law, to amount to a constructive eviction; and third, that the court erred in admitting certain testimony and in giving and refusing to give certain instructions.

Appellants' contention that no relationship of landlord and tenant existed between the parties at the time of the alleged constructive eviction is based upon the provision in the lease, reiterated in the assignment to Hoffman, that the lease should not be assigned without the written consent of the lessor. They allege that there is no evidence to indicate that the Ruffs, the original lessors, knew that this assignment was made in connection with a conditional sales agreement; that they did not sign, and knew nothing of, the agreement between Coulos and Armatas and the Hoffmans, citing the circumstances under which the former might repossess the property; and that, since they had given no consent to this repossession, appellants, as their successors, had a right to treat Hoffman as their sole tenant.

Respondents contend that, in view of the record, which shows that the contract of conditional sale, the assignment, and the agreement were all drawn up in the office of the elder Burkheimer, and that the younger Burkheimer was the agent who handled the property for the Ruffs, the inference is inescapable that the Ruffs were aware of all aspects of the transaction, and knew that the assignment was conditional on the Hoffmans meeting the lease payments. (We may mention in passing that the younger Burkheimer testified that, although he collected the rents from the property for the Ruffs, he did not represent them in connection with the sale.) Whether this inference is justified, and in any case whether it should be invoked to modify the express terms of the assignment, we need not now consider, as, in our view, the clause requiring written consent of the lessor to any assignment of the lease is not applicable to a transfer of the character of that with which we are here concerned.

It is true that the parties to an original lease may lawfully covenant that no assignment of the lease or any

part thereof should be valid without the written consent of the lessor, and an assignment in violation of such covenant will confer no rights on the assignee. *Behrens v. Cloudy*, 50 Wash. 400, 97 Pac. 450. However, such covenants, being restraints upon alienation by the lessee, are not favored in the law and are strictly construed. *Burns v. Dufresne*, 67 Wash. 158, 121 Pac. 46. It has been held that such a covenant is not broken where the assignment, executed without the lessor's consent, is made by an assignee back to the original lessee. The reason therefor is stated in *McCormick v. Stowell*, 138 Mass. 431, as follows:

"The covenant by the lessee, that he or others having his estate in the premises will not assign this lease without the written consent of the lessor, does not by its true construction extend so far as to prohibit a reassignment to the lessee himself without a new and special consent of the lessor. *By the lease itself, the lessor consents to take the lessee as his tenant for the full term mentioned in the lease.* This consent is available for any reassignment to the original lessee during the term. There was therefore no breach of the covenant. The statement in the bill of exceptions, that the reassignment has never been consented to, means only that no special consent has been given; and this was unnecessary." (Italics ours.)

See, also, 3 Thompson on Real Property 675, § 1435.

In the present case, the agreement executed between Coulos and Armatas and the Hoffmans was clearly binding as between them. Although it expressly provided for surrender of possession by the latter only in case of default in the terms and conditions of the *lease* (and no such default is shown here), it contained, in paragraph three, the words: "So long as the second parties are not in default in any of the terms and conditions of said *contract of conditional sale,* they shall be entitled to the use and possession of the premises," (italics ours) from which the implication is clear that, in case of a default of this character, Coulos and Armatas, the named second parties, would be entitled to repossession. And Coulos and Armatas being the original lessees of the Ruffs, the consent of the latter was not required in order for

them to repossess the property and resume payments under the lease.

Appellants object that the sheriff had no authority to take possession of the restaurant itself under the authority of writ of replevin dealing only with the personal property therein. The evidence, however, shows that Hoffman gave the keys to Desimone to hold for Coulos and Armatas prior to the actual levy; and while he might have done this solely because of the threat of the levy, he was acting in accordance with the terms of his agreement. If the sheriff exceeded his authority in levying on the restaurant itself, Hoffman might well have been in a position to object to his doing so; but none of appellants' rights was breached thereby, and they have no cause to complain.

■■ Appellants contend that the evidence was insuffi- ·cient for the jury to find that Coulos and Armatas were constructively evicted from the restaurant. The rule is that any intentional or injurious interference by the landlord or those acting under this authority, which deprives the tenant of the means or the power of beneficial enjoyment of the demised premises or any part thereof, or materially impairs such beneficial enjoyment, is a constructive eviction. *Tennes v. American Building Co.*, 72 Wash. 644, 131 Pac. 201; *Cline v. Altose*, 158 Wash. 119, 290 Pac. 809, 70 A. L. R. 147. In the latter case, we said:

"While repeated trespasses on the leased property by the landlord, and insults and annoyances offered the tenant by him, if long continued, will operate as a constructive eviction, single instances of these sorts will not do so, even if they be of such a nature as to support an action in damages against the landlord."

As the question here raised is whether the evidence, as a matter of law, could possibly support a verdict of constructive eviction, we must consider it in the aspect most favorable to respondents. We believe the jury could have found that, with appellants denying respondents' title to the leasehold, refusing to accept the rent, threatening to oust Coulos from the premises, and engaged in disparaging respondents' title before members of the public and prospective purchas-

ers, there was no obligation on respondents' part to attempt to further continue operation of the business, and that they were justified in abandoning the premises and looking to appellants for repairment of the damage they thereby sustained. Under such a state of facts, we believe that the jury could well have concluded that the abandonment of the premises was as involuntary as if there had been an actual forcible eviction. *Hobson v. Union Oil Co.*, 187 Wash. 1, 59 P. (2d) 929.

The court gave instruction No. 4, in part, as follows:

" . . . The assignment of the original lease (Ex. 4) contains a clause or provision to which your attention is directed. It reads:

" 'It is understood, however, that the first parties are not relieved from any of the obligations under the terms of said lease in case of default of the second parties.'

"The 'assignment,' of which the foregoing is a part, was submitted to the original owners, Ruff and his wife, at a date undisclosed and was signed by them by a consent attached to the assignment itself (Ex. 4). The 'Consent to Assignment' reads as follows:

" '*Consent to Assignment*

" 'We hereby consent to the foregoing assignment and to the terms and conditions therein stated: Provided, however, that no further assignment of said lease shall be made without the written consent of lessors.'

"You are instructed that the lease between Ruff and wife, as grantors, and Coulos and Armatas, as grantees, had imposed as one of the provisions of the lease:

" 'This lease shall not be assigned by operation of law, or otherwise, nor any part of the premises sublet without the written consent of the lessors being first obtained in writing.'

"By this printed clause inserted in the original lease, it was designed and intended to prevent any assignment under the lease to another person without the consent of the owners or grantors therein, but it *becomes ineffective*, in the view of the court, when the same instrument at the same time continues and further imposes obligations to keep and perform the terms imposed under the lease itself. The court is of the opinion, and so directs, that it is the rule of law in the case that the plaintiffs would be entitled to repossession

of the property in question if they, at the same time, had otherwise kept and performed the terms and conditions of the original lease executed by them." (Italics ours.)

In so far as it told the jury that the covenants against assignments were not breached by the action of the respondents in repossessing the property, we are of the opinion that this instruction was correct (though we may not agree with the reasoning used by the court in arriving at that conclusion). The use of the words "becomes ineffective" without qualification was, however, unfortunate. By these words, the court told the jury that these covenants had ceased to have any effect whatever, whereas they were clearly effective to prohibit any subsequent assignments of the lease which Coulos and Armatas might have chosen to make without receiving the written consent of the lessor. As is said in 32 Am. Jur. 305, § 343:

"In the absence of anything to the contrary expressed by the terms of a contract restricting the lessee's right to make assignments unless the lessor consents thereto, the lessor has the full and arbitrary right to refuse to give his consent to an assignment, irrespective of the character of the proposed assignee and although he is actuated by mere caprice or whim."

In its instruction No. 5, the court, using the language of the Washington cases cited *supra*, told the jury:

". . . A constructive eviction occurs when a tenant is forced to vacate the leased premises because of acts by the landlord, or those acting under his authority, which are an interference of a substantial nature, so far injurious to the tenant's rights as to deprive the tenant of the beneficial use and enjoyment of the premises. . . ."

Having been told in instruction No. 4 that the covenants against assignment were ineffective, the jury could well have concluded that Coulos and Armatas had an absolute right to assign the lease to whomever they chose; and that the written refusal of the elder Burkheimer, acting on behalf of Desimone, to agree to consent to a future assignment of the lease, which would, of course, discourage prospective purchasers from investing in the business, was such an in-

terference with the tenants' rights as to deprive them of the beneficial use and enjoyment of the premises. Consequently, without departing from the language of instruction No. 5, the jury could have found an eviction from this refusal alone. It appears to have been the position of respondents' counsel that the law would have permitted the jury to do so.

This position, however, was clearly unsound. Respondents' cause of action must be predicated on the landlord's alleged denial of their right to the beneficial use and occupation of the premises for the thirteen-month period the lease had to run. It cannot be based on the landlord's denial of their right to assign the lease without his consent, for the right of assignment and consequently of sale was not guaranteed by the lease, but, on the contrary, was expressly made contingent upon obtaining the landlord's consent thereto. Unless the jury found that Desimone intended not only to withhold his consent to any further assignment of the lease, but that he also intended to interfere with and prevent plaintiffs' operation of their restaurant themselves, there was no valid basis for its verdict of constructive eviction. Under instructions Nos. 4 and 5, however, the jury was not required to make the latter finding in order to hold that a constructive eviction had taken place.

With a view to curing this situation, appellants requested the following instruction:

"You are instructed that by virtue of the terms of the lease between the parties, the defendants had an absolute right to refuse to consent to the further assignment of the lease by the plaintiffs. If the plaintiffs have failed to prove by the requisite degree of proof that some other act or acts of the defendants, or either of them, or their agents, were the cause of the plaintiffs' moving from the premises, your verdict must be for the defendants."

In view of the phraseology of the other instructions, we think that the court should have given this instruction, and that its failure to do so constituted prejudicial error.

Appellants requested an instruction to the effect that acts complained of as constituting a constructive eviction

must be committed in bad faith. Here, there can be no question but that Desimone knew that Coulos and Armatas were occupying the premises under a bona fide claim of right; he had surrendered the keys to them on that basis only a few days previous to the alleged acts of constructive eviction. He may have believed in good faith that his claim of right would prevail over theirs; but if his acts amounted to an eviction, he is liable for their consequences even so.

■ Appellants objected to the admission of testimony to the effect that the lessee of the premises, at the time of the trial, who, in January, 1948, had been using them for about a year "as a club," was then paying a rent of $350 per month. The court instructed the jury that the measure of damages in this case would be the amount proved by the plaintiffs by which the rental value of the property exceeded the rent for the balance of the term of the lease. We think this testimony was clearly admissible for the purpose of helping to establish the rental value, especially as it would appear that this lessee took over the premises during the period that respondents' lease would have been in effect had it not been terminated. Of course, it would have been permissible for appellants to have rebutted this testimony with evidence comparing the rental value of the establishment used as a restaurant and used as a club.

The judgment is reversed and the cause remanded to the trial court for a new trial.

MALLERY and SCHWELLENBACH, JJ., concur.

SIMPSON and HILL, JJ., concur in the result.

---

August 12, 1949. Petition for rehearing denied.