[No. 3549–1.   Division One.   April 25, 1977.]

DAVID L. OLSON, *Respondent,* v. ROBERT W. SCHOLES, ET AL, *Appellants.*

*Hageman, Prout, Kirkland & Coughlin* and *David T. Kirkland,* for appellants.

*Peter D. Francis,* for respondent.

CALLOW, J.—This action involves an alleged breach of a written commercial lease and claimed tortious conduct by the lessee.

In January 1970, the defendant–lessee Robert W. Scholes (then a single man) entered into a commercial lease with the plaintiff–lessor Olson. The leased property included a dog kennel, a cattery, and two residences. The defendant was experienced in kennels and kennel management before entering into the lease with the plaintiff and enjoyed a good reputation in the business.[1] After the defendant had operated the kennels for a substantial period of time, he became aware of the physical problems of the premises and that the water and sewer systems did not conform to the respective codes. As a result, 2 years after the initial lease was entered into the parties negotiated a new lease agreement.[2] Included in the new lease agreement were provisions calling for a lower rent and adding a 90–day notice requirement of intent to terminate the lease agreement.

[1]Pertinent parts of the original lease are as follows:

"7. Lessee shall be responsible for the full and complete repairs and maintenance to the buildings and related equipment and fixtures, including those items laid out in the attached inventory, which shall include, but not be limited to, painting, roof and foundation repairs, electrical, mechanical, plumbing, drainage, sewer and septic, water well and attendant equipment, etc., it being the intent of the Lessor to turn over the entire property as defined to Lessee, and for Lessee to surrender said property in similar condition, less ordinary wear and tear, at the end of the term of this lease, or any extension thereof. Any and all expense of said repairs and maintenance shall be borne and paid for by Lessee, and he shall not allow any liens to be placed against said property for non–payment of any of the noted items.

"9. Lessee shall maintain and keep the premises and miscellaneous equipment in at least as good repair and condition as they were at the beginning of this lease, and he shall not permit or commit waste upon or to the leased premises.

"25. In the event the Kennel operation shall, by operation of law, due to no fault of the Lessee, be closed down, or be forced to cease to operate, as a Kennel, then this lease shall be void from that time forward and Lessee shall have no further liability under its terms."

[2]Paragraph 7 of the original lease was modified as follows:

"Paragraph #7 is hereby altered to the extent of the addition of the following sub–paragraph:

"Owner does not certify to the condition of the existing well water as being fit for human consumption, nor does owner certify to the adequacy of the septic and/or sewerage system. Tenant assumes full responsibility, and agrees to hold owner harmless for any liability to owner as a result of the tenant, sub–tenants, guests, clients, customers, workers, and any or all other persons or animals who

In June of 1973, defendants moved out and subleased to another operator who vacated the premises shortly thereafter. From that point on no kennel business was in operation at that location. After the premises were vacant, the defendant called the Snohomish County Building Department and requested an inspection of the premises. Subsequently, an inspection was carried out by representatives from the Building Department, Health Department, and Fire Marshal's office. Numerous health and electrical code violations were found. It was the decision of the Building and Health Departments and the Fire Marshal's office to not allow the kennel to reopen until the premises were brought into code compliance.

After the property had been vacated and following the subsequent inspections, the defendant–lessees wrote the plaintiff stating that the premises were condemned, that they had moved out, and requested a return of their lease deposit. No 90–day notice was given the plaintiff.

As a result of the condemnation of the premises and the requisite repairs, plaintiff was unable to lease the premises for over 1 year. Plaintiff also lost the right to continue use of the kennels under the prior zoning requirements and had to apply for a variance. This action was then commenced to recover damages for the alleged breach of the lease and tortious conduct. In addition to the facts already set out, the trial court made the following findings of fact *inter alia:*

7. Had the business still been in operation the business would have continued to operate while the premises were being brought up to code. Because the premises were vacant and the business was not operating, it was required that the premises be brought up to code before a license could be issued and someone else could move in to operate the kennels.

8. Plaintiff had a reasonable expectancy of re–renting the premises, and would have been able to rent the premises had not the actions of defendant prevented the

may for any reason claim any injury or damage or other claim in any connection with the water and/or sewerage system."

continued operation of the kennels without first complying with the aforementioned code requirements. This expectancy was apparent to defendant, who knew that plaintiff wanted to be able to re–lease the premises as a kennel whenever defendant moved out. This interference was intentional. The action of defendant was taken in an attempt to get out from under the ninety day notice requirement in the lease agreement.

9. The report by telephone to the authorities was done while defendant owed the ninety days rent, and while the premises were vacant. The report was made for the express purpose of condemning the business premises.

10. Damage to and loss of personal property other than ordinary wear and tear which resulted from defendant's tenancy is in the amount of $200.

11. Damage to the real estate itself other than and in excess of ordinary wear and tear is in the amount of $650, for the period of defendant's occupancy.

12. Defendant is liable to plaintiff for $900 for rent owing for the ninety day notice period, less the $350 deposit for which defendant is entitled to credit.

13. Defendant is further liable to plaintiff for an additional seven months beyond the ninety day period during which the property was not rentable as a kennel while the repairs were being made. Because some rent could have been obtained at a lesser figure, the reasonable loss of rental income caused by defendant's actions was $175 per month for the seven month period.

14. Because the lack of continuity of the business in that there was almost a year hiatus the value to plaintiff of the property was reduced by, and plaintiff is thereby damaged by, the sum of $500.

15. Some of the damages to plaintiff were caused by the tortious actions of defendant Robert Scholes. The remainder of the damages were caused by violations of provisions of the lease, and a reasonable attorney's fee which defendant should be required to pay on account of plaintiff's attorney's fees incurred because of breach of the lease is the sum of $400.

Judgment was found for the plaintiff as follows:

1. For personal property not returned
   to lessor                                    $200.00
2. For damage to real property                   650.00

| | |
|---|---|
| 3. For 3 months' rent | 900.00 |
| 4. For tortious interference with business expectancy | 1,225.00 |
| 5. For loss of good will (tortious interference) | 500.00 |
| 6. For attorney's fees (as to claim for breach of lease only) | 400.00 |

The defendants appeal.

The questions raised are (1) whether the lessees committed an act of tortious interference with the lessor's business expectancy; (2) whether (a) an implied warranty of habitability extended to this lease, or (b) were the lessees entitled to vacate the premises because of their condition; and (3) whether the lessees breached the lease by violating the lease clause on repairs.

█ We find that the trial court's findings of fact, insofar as they state substantive facts, are supported by substantial evidence. We will not retry those facts here. *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959); *Rogers Walla Walla, Inc. v. Ballard,* 16 Wn. App. 81, 553 P.2d 1372 (1976).

The lessees, as appellants, have set out as assignments of error the trial court's entry of findings of fact Nos. 7 through 15, the trial court's conclusions of law, and the failure of the trial court to enter 23 proposed findings and conclusions. A broadcast condemnation of each finding and conclusion such as this is of no assistance to an appellate court in ascertaining the contentions raised on appeal. This appeal was pending prior to the effective date of the Rules of Appellate Procedure, and the Court of Appeals Rules on Appeal apply. Under CAROA 43, each error of the trial court was to be "definitely pointed out in the 'assignments of error' . . ." As stated in *Knatvold v. Rydman,* 28 Wn.2d 178, 183, 182 P.2d 9 (1947):

> The assignments that the trial court erred in making fourteen findings of fact, without any attempt to show wherein the findings were erroneous or lacked evidenciary support, is an invitation to us to search the

record and see if we can find any error. It is not our function or duty to search the record for errors, but only to rule as to errors specifically claimed.

See also *Malnati v. Ramstead*, 50 Wn.2d 105, 309 P.2d 754 (1957); *Bristol v. Streibich,* 24 Wn.2d 657, 167 P.2d 125 (1946).

Rule 10.3(a)(3) of the Rules of Appellate Procedure now provides:

**(a) Brief of Appellant or Petitioner.** The brief of the appellant or petitioner should contain under appropriate headings and in the order here indicated:

. . .

(3) *Assignments of Error.* A separate concise statement of each error a party contends was made by the trial court, *together with the issues pertaining to the assignments of error.*

(Italics ours.) The lessees did set forth the issues following the listing of the assignments of error. We would not have been able to answer the issues presented if this had not been done. We will address the contentions set forth by the appellant as the basic problems submitted.

## I.

Was an act of tortious interference committed by lessees against the lessor's business expectancy?

The plaintiff contends that the defendants interfered with the business expectancy of the kennels when they requested an inspection of the kennels by the county authorities. The theory advanced is that stated in Restatement of Torts § 766 (1939), as follows:

[O]ne who, without a privilege to do so, induces or otherwise purposely causes a third person not to
(a) perform a contract with another, or
(b) enter into or continue a business relation with another
is liable to the other for the harm caused thereby.

The tort as defined in the Restatement is divided into two parts: (a) dealing with the cause of action arising when a third person induces a breach of contract, and (b) dealing

with the cause of action which arises when a third person induces one person not to enter into a contract with another. The first subsection deals with present relationships, and the second with future relationships. The elements of the tort have been stated as:

(1) the existence of a valid contractual relationship or business expectancy;

(2) knowledge of the relationship or expectancy on the part of the interferor;

(3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and

(4) resultant damage to the party whose relationship or expectancy has been disrupted.

*See King v. Seattle,* 84 Wn.2d 239, 525 P.2d 228 (1974); *Scymanski v. Dufault,* 80 Wn.2d 77, 491 P.2d 1050 (1971); *Corinthian Corp. v. White & Bollard, Inc.,* 74 Wn.2d 50, 442 P.2d 950 (1968), and *Calbom v. Knudtzon,* 65 Wn.2d 157, 396 P.2d 148 (1964), *inter alia.*

■ However, this theory does not apply to actions where the contest is between parties to an existing contract. The cause of action exists only against outsiders who interfere with the contractual relationships or business expectancies of others. A landlord–tenant relationship existed between the plaintiff and the defendants when the claimed tortious acts occurred, and therefore any right to redress cannot be based upon the tort theory of business interference. If the plaintiff is to recover, his cause of action must arise from the violation or breach of the contractual relationship. *Stauffer v. Fredericksburg Ramada, Inc.,* 411 F. Supp. 1136 (E.D. Va. 1976); *Sherman v. Weber Dental Mfg. Co.,* 285 F. Supp. 114 (E.D. Pa. 1968); *Wild v. Rarig,* 302 Minn. 419, 234 N.W.2d 775 (1975), *appeal dismissed,* 424 U.S. 902, 47 L. Ed. 2d 307, 96 S. Ct. 1093 (1976); *Hein v. Chrysler Corp.,* 45 Wn.2d 586, 277 P.2d 708 (1954); *Cherberg v. Peoples Nat'l Bank,* 15 Wn. App. 336, 549 P.2d 46 (1976). As stated in *Hein v. Chrysler Corp., supra* at 596:

The tort of malicious interference with contractual relations by inducing a breach of contract is a remedy created by the common law to compensate one whose contractual relations with others is interfered with *by a third party. Doremus v. Hennessy,* 176 Ill. 608, 52 N. E. 924, 54 N. E. 524; *Canister Co. v. National Can Corp.,* 96 Fed. Supp. 273. In the latter case, the court commented that, under New York law,

". . . an action for inducing a breach of contract will lie against a third party but a party to the contract itself cannot be held responsible [in tort] for inducing himself to commit a breach of that contract or for conspiring to breach it." *Canister Co. v. National Can Corp., supra.*

However, while the lessors cannot recover under the tortious business interference theory of Restatement of Torts § 766, they are entitled to recover those damages flowing from the lessees' breach of the lease provisions requiring the lessees to keep the equipment and premises in "full and complete" repair and maintenance and to give the lessor a 90-day notice of intent to cancel the rental agreement.

██ The decision of the trial court may be upheld on any proper theory if the decision made upon trial reached the correct result though based upon an incorrect theory. *Fischnaller v. Sumner,* 53 Wn.2d 332, 333 P.2d 636 (1959). The trial court found that the operation as a kennel could have been continued while the premises were being improved to conform with the building, fire and health codes, that this was not possible due to the interruption caused by the lessees' failure to give the required 90-day notice, and that the consequences of the lessees' breach were the loss of rental for a 7-month period and an additional loss because of the break in the continuity of the business. The lessors are entitled under the lease provisions to recover rents and for damages for breach of the covenants of the lease. *See Pollock v. Ives Theatres, Inc.,* 174 Wash. 65, 24 P.2d 396 (1933). They may recover those consequential damages which flow from the breach of the lease and reasonably could have been anticipated by the parties. *See Larsen v. Walton Plywood Co.,* 65 Wn.2d 1, 390 P.2d

677, 396 P.2d 879 (1964); *Pettaway v. Commercial Automotive Serv., Inc.,* 49 Wn.2d 650, 306 P.2d 219 (1957); *Carlson v. Leonardo Truck Lines, Inc.,* 13 Wn. App. 795, 538 P.2d 130 (1975); 49 Am. Jur. 2d *Landlord and Tenant* § 183 (1970). The fixing of damages reflects a compensation reasonably determined to place the lessor in the financial position he would have occupied had not the breach occurred. *See Pague v. Petroleum Prods., Inc.,* 77 Wn.2d 219, 461 P.2d 317 (1969). However, no challenge is raised to the method of fixing damages applied by the trial-court, and therefore we will not disturb the amount of the judgment on appeal.

## II.

(A) Did an implied warranty of habitability extend to the lease, or were the lessees entitled to vacate the premises because of their condition?

■ The lessees assert that the lessors impliedly warranted that the premises were habitable, citing *Foisy v. Wyman,* 83 Wn.2d 22, 515 P.2d 160 (1973). In the *Foisy* case the court was concerned with a residential lease where the defects in the premises were items which made a rented house unfit for human habitation. Here, except for minor inconsequential exceptions, the deficiencies found were in the commercial facilities used for dogs and cats and not for human living quarters. As discussed in J. Page, *Law of Premises Liability* §§ 9.30–9.36 (1976), the implied warranty of habitability has generally been imposed in residential leases. It has not been extended to commercial leases in the usual situation. Stoebeck, *The Law Between Landlord and Tenant in Washington,* 49 Wash. L. Rev. 291, 344 (1974).

In *Reste Realty Corp. v. Cooper,* 53 N.J. 444, 251 A.2d 268, 33 A.L.R.3d 1341 (1969), following a scholarly discussion of the history of the implied warranty of habitability, the court imposed such a warranty in a lease of office space for commercial purposes, but nonetheless for human occupancy. It was further noted by the opinion that the defects

in the walls and foundations of the building there in question were not so apparent that the lessee would or should have known that the rented first floor office would be subject to flooding and that the defects in the outside walls and foundation were not within the space rented by the tenant. In the present case, the defendant–lessee Scholes could see the defects and problems of the rented kennels, accepted the leased premises in "as is" condition, and had operated the kennels for over 2 years before the falling out between the parties occurred. He cannot claim an unawareness of the physical shortcomings of the kennels. It may be that a situation will arise where such a warranty should be imposed in a commercial lease, but we decline to do so in this case.[3]

(B) Were the tenants entitled to vacate the premises because of their condition?

The trial court stated the following in its oral opinion concerning the motivations of the defendant in vacating the premises:

[A]fter inspecting the premises and negotiation with Mr. Olson, obtained the lease. So in the first instance Mr. Scholes knew of the difficulties of the premises when he entered into the lease, and probably more importantly, after substantial time on the premises was well aware of the problems of the kennel, and negotiated a modification or an additional lease. And in all cases Mr. Scholes could have walked away from his responsibilities by giving 90 days notice, which meant he would be responsible, of course, for those 90 days as far as the rent is concerned. That did not happen in this case.

Mr. Scholes made the determination to move to another location and obtained what appeared to be a sub–tenant, which did not work out. Then after the premises were vacant Mr. Scholes, in the Court's opinion made the mistake in law of notifying his friend, Mr. Autrey, to come and inspect the premises.

---

[3]The Residential Landlord–Tenant Act of 1973, RCW 59.18, is inapplicable to the problem before us. By its terms it pertains to human dwelling places and living arrangements.

The trial court also noted that the lessees were incited by a desire to rid themselves of the responsibilities of this location, while precluding it as a site of possible competition to the new kennels to which they were moving. The trial court's observations reflected that the defendant left primarily because he wished to move elsewhere and not because conditions had become so intolerable as to amount to a constructive eviction. Though the lessees may feel themselves aggrieved by the condition of the premises, the conditions were known to Mr. Scholes when he moved into the kennels and the lease put the burden of repair and maintenance upon the lessees clearly and emphatically.

■ A tenant is not constructively evicted from a leasehold unless the landlord has failed to perform a duty that exists under the lease. It was said in *Erickson v. Elliott,* 177 Wash. 229, 232, 31 P.2d 506 (1934):

> The question is whether the appellants were entitled to vacate the building prior to the time that the term specified in the lease had expired, and this depends upon whether there was a constructive eviction. Such an eviction takes place if the landlord does any wrongful act or is guilty of any neglect or default whereby the premises are rendered unsafe, unfit or unsuitable for occupancy for the purpose for which they were leased; but there can be no constructive eviction unless the landlord is at fault.

and in *Myers v. Western Farmers Ass'n,* 75 Wn.2d 133, 134–35, 449 P.2d 104 (1969), the court stated:

> A constructive eviction occurs when there is an intentional or injurious interference by the landlord or those acting under his authority, which deprives the tenant of the means or the power of beneficial enjoyment of the demised premises or any part thereof, or materially impairs such beneficial enjoyment. *Coulos v. Desimone,* 34 Wn.2d 87, 208 P.2d 105 (1949). Whether there has been such an eviction is, of course, generally a question of fact to be determined by the trier of the facts.

The trial court laid the responsibility for the condition of the premises at the feet of the lessees, and we will not disturb on appeal the findings made by the trier of the facts in

this area. *Aro Glass & Upholstery Co. v. Munson–Smith Motors, Inc.,* 12 Wn. App. 6, 528 P.2d 502 (1974).

III.

Did the lessees breach the lease by violating the repair clause therein?

The trial court found that there was damage to the real estate in excess of ordinary wear and tear in the sum of $650. That finding could be made from the evidence and it is not for us to overturn it.

The parties had the choice of placing the duty of making repairs upon either and bargained in this case for the lessees to have that responsibility. *See Puget Inv. Co. v. Wenck,* 36 Wn.2d 817, 221 P.2d 459, 20 A.L.R.2d 1320 (1950); *Publishers Bldg. Co. v. Miller,* 25 Wn.2d 927, 172 P.2d 489 (1946); *Arnold–Evans Co. v. Hardung,* 132 Wash. 426, 232 P. 290, 45 A.L.R. 9 (1925); 3A G. Thompson, *Commentaries on the Modern Law of Real Property* § 1232 (J. Grimes 1959 repl.). We find no error in the trial court's finding and the conclusion based upon it.

The judgment of the trial court is affirmed. The plaintiff is entitled to recover damages as awarded by the trial court.

The lease provides:

21. In the event of the employment of an attorney because of the violation by Lessee of any term or condition of this lease Lessee agrees to pay such attorney's fees.

The terms of that clause entitle the plaintiff to reasonable attorney's fees for the full term of the attorney's employment in accordance with this provision of the lease. The right to attorney's fees in this case comes from the lease provision and not from lien foreclosure or other statutes. *See McMillan v. Great Northern Ry.,* 45 Wn.2d 802, 278 P.2d 316 (1954); *Franklin v. Fischer,* 34 Wn.2d 342, 208 P.2d 902 (1949); *Standard Lumber Co. v. Fields,* 29 Wn.2d 327, 187 P.2d 283, 175 A.L.R. 309 (1947); *Flint v. Bronson,* 197 Wash. 686, 86 P.2d 218 (1939). The cause is remanded to the trial court for the fixing of reasonable attorney's fees

for the services attributable to this action from its beginning to its conclusion.

SWANSON, J., concurs.
WILLIAMS, J., concurs in the result.