**AMERICAN SOCIETY OF TRAVEL AGENTS, INC., et al., Plaintiffs,**

**v.**

**BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, and James Smith, Comptroller of the Currency of the United States of America, Defendants.**

**No. C-74-2308 ACW.**

United States District Court,
N. D. California.

Nov. 22, 1974.

Alexander Anolik and Suzanne Mc-Donnell, San Francisco, Cal., for plaintiffs.

Robert H. Fabian, Sherwood K. Freeman, Richard J. MacLaury, Calvin B. Grigsby and Robert A. Mittelstaedt, Pillsbury, Madison & Sutro, San Francisco, Cal., for defendant Bank of America.

James L. Browning, Jr., and Brian B. Denton, San Francisco, Cal., for defendant James E. Smith.

Richard W. Graham, Koster, Kohlmeier & Graham, P. C., San Francisco, Cal., for intervenor/defendant Pacific Pathways, Inc., dba Pathways International Inc.

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION AND DENYING MOTION TO DISMISS

WOLLENBERG, District Judge.

Plaintiffs, a national trade association of travel agents, four local chapters of

the national trade association, a travel club operator, and individuals and corporations doing business within California as retail and wholesale travel agents, seek a preliminary injunction to prevent Defendant Bank of America National Trust and Savings Association (hereinafter "Bank of America") from implementing a proposed travel club, under which Plaintiffs claim the Bank of America would be selling tours and providing other travel services in violation of the National Bank Act, 12 U.S.C. §§ 24 (seventh) and 1864.[1] This case raises in a novel context issues which were litigated in Arnold Tours Inc. v. Camp, 338 F.Supp. 721 (D.Mass.1972), aff'd. 472 F.2d 427 (1st Cir. 1972), and Investment Company Institute v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971). A review of those cases and of the contractual agreement [2] under which the travel club will be operated should contribute to an understanding of the Court's ruling on this motion for a preliminary injunction.

In the *Arnold Tours, Inc.* case, South Shore National Bank had bought the fourth largest travel bureau in New England and operated it as a department of the bank for approximately six years preceding the commencement of the lawsuit. In addition to its regular banking operations, South Shore National Bank offered the services of its travel agency as incidental to the business of banking as defined and authorized through regulations of the Comptroller of the Currency.[3] Plaintiffs, forty-two independent travel agencies, sought declaratory and injunctive relief, claiming the National Bank Act, 12 U.S.C. § 24 (seventh) prohibits national banks from engaging in the travel bureau business. Plaintiffs sought a declaratory judgment invalidating the Comptroller's regulations, *supra,* and an injunction prohibiting South Shore National Bank from continuing to operate its travel service department.

It was beyond dispute in *Arnold Tours, Inc.* that South Shore National Bank was engaged in the travel bureau business, and the only question before the District Court and the Court of Appeals for the First Circuit was whether that business was authorized by the National Bank Act, 12 U.S.C. § 24 (seventh), as one of the "incidental powers as shall be necessary to carry on the business of banking". While the Court of Appeals gave the term "necessary" a fairly expansive reading, encompassing those activities which are "convenient" or "useful" to the banking enterprise,[4] it nevertheless held that national banks may not provide services or engage in activities which are not "directly related to one or another of a national bank's express powers." 472 F.2d at 431. "If this connection between an incidental activity and an express power [under the National Bank Act] does not exist, the

1. 12 U.S.C. §§ 24 (seventh) provides in pertinent part as follows:

  [A national banking association] shall have power—

      \*     \*     \*     \*     \*

  Seventh. To exercise . . . all such incidental powers as shall be necessary to carry on the business of banking . . ..

12 U.S.C. § 1864 provides as follows:

No bank service corporation may engage in any activity other than the performance of bank services for banks.

2. The text of the agreement is found as Exhibit A attached to the affidavit of Nachtrieb filed November 11, 1974, which Defendant Bank of America's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Preliminary Injunction.

3. 12 C.F.R. § 7.7376 (1974). This section provides as follows, in pertinent part:

(a) General rule. With the prior approval of the Comptroller of the Currency, a national bank may engage in activities, which are a part of the business of banking or incidental thereto, by means of an operating subsidiary corporation. . . .

(b) Activities permitted. An operating subsidiary may perform any business function which the parent bank is permitted to perform. For example, through a bank department or an operating subsidiary, a national bank may issue credit cards, service mortgages, lease property, offer travel services, or operate a credit bureau.

4. 472 F.2d at 430–431, 432.

activity is not authorized as an incidental power." 472 F.2d at 432. The Court of Appeals concurred in the judgment of the District Court that the operation of a travel bureau is not incidental to the traditional business of banking, notwithstanding that it may be convenient and useful in attracting customers who may also become depositors and borrowers. The Court of Appeals affirmed the District Court's order declaring the Comptroller of the Currency's regulations invalid and requiring South Shore National Bank to divest itself of its travel bureau operations.[5]

In Investment Company Institute v. Camp, *supra*, the First National City Bank of New York obtained the consent of the Comptroller of the Currency to establish and operate a mutual investment fund whereby investors would tender to the bank anywhere from $10,000 to $500,000, and the bank would use the money to purchase securities for its investment fund account. In return for their investment, participants in the plan would receive "units of participation" according to the size of their investment; these units would be transferable, and earnings on investments by the fund would be distributed to investors in proportion to the size of their investment. The Supreme Court recognized that federal banking laws permitted national banks to hold money in trust and to pool moneys held in trust for different depositors and to use these funds to purchase securities in the names of the depositors, but the Court nevertheless held that the National Bank Act, as amended by Section 16 of the Banking Act of 1933, 48 Stat. 184 (June 16, 1933), prohibits national banks from selling shares in a fund which is then used to buy securities in the name of the bank.

██ The *Investment Company Institute* case cannot be dispositive of the issues before this Court because the Supreme Court there held the disputed mutual fund operation of First National City Bank of New York to violate an express prohibition of the National Bank Act. 401 U.S. at 625, 91 S.Ct. 1091, 28 L.Ed.2d 367. While the Act does not address itself directly to the question of national banks engaged in the travel bureau business, the Supreme Court's discussion of Congressional purpose for excluding national banks from the investment banking business helps illuminate the objectives underlying the policy of confining national banks to exercising only "such incidental powers as shall be necessary to carry on the business of banking."

The exclusion of national banks from the mutual fund business was intended not merely as a device to curtail competition in the investment banking field, but was a legislative response to the concern felt in Congress that such an expansion of the business activity of national banks could undermine the banks' stability as traditional banking institutions. Even if the bank risks none of its own funds in the non-banking related venture, "pressures are created because

---

5. The District Court laid to rest the dispute over whether supplying travel services has traditionally been a function of national banks by demonstrating that the disagreement is largely a semantic quarrel. Simply because banks had provided certain services for travelers 100 years earlier does not mean the services of a modern travel bureau were traditionally performed by national banks. 338 F.Supp. at 724. The travel-related services performed by national banks during the first half of this century more closely resembled the public service activity endorsed in Corbett v. Devon Bank, 12 Ill. App.3d 559, 299 N.E.2d 521 (1973), than the type of all-out investment in a retail business disapproved in *Arnold Tours, Inc. See* 472 F.2d at 434.

Neither the Bank of America nor the Comptroller of the Currency contests the ruling in *Arnold Tours, Inc.*, and the Court is informed that the Comptroller is in the process of revising the regulation there invalidated. As will be more fully developed below, the position taken by the Bank of America and by the Comptroller is that the Bank of America's intended travel-related activities, as set forth in the agreement of June 30, 1974, are authorized by the National Bank Act, 12 U.S.C. § 24 (seventh), as interpreted and applied in *Arnold Tours, Inc.*

the bank and the affiliate are closely associated in the public mind, and should the affiliate fare badly, public confidence in the bank might be impaired." 401 U.S. at 631, 91 S.Ct. at 1099. The concern of Congress expressed by the Court was that public confidence is so important to the solvency of a bank that if the affiliated business fails to prosper, the bank might be tempted to pour money into the failing business with which the bank has closely associated its name and reputation. The strength and stability of a bank can thus be undermined even if the bank invests none of its own money in the affiliated business.

Congress was also concerned "that the bank's salesman's interest [in the affiliated business] impair[s] its ability to function as an impartial source of credit." 401 U.S. at 631, 91 S.Ct. at 1099. Banks might be tempted to extend credit imprudently if such decisions are influenced by the need to "prime the pump" of an affiliated business. Congress was also afraid investors would buy securities in reliance on the bank's reputation for prudence and restraint and that this might impair sound investment decisions by investors. Likewise, consumer decisions regarding the purchase of commodities and services may be unduly influenced by the association of these items with a respected financial institution.

On June 30, 1974, the Bank of America entered into a contractual agreement with an existing travel bureau under which each of the parties assumed certain responsibilities for promoting and operating the travel club. The parties to the agreement were the Bank of America, Pacific Pathways, Inc., (hereinafter "Pathways") a California corporation engaged in the travel bureau business, and C. Fred Holmes, owner of all of the stock of Pathways. Under the agreement Pathways agrees to create a new division within the corporation called "Travel Club Division", and this division will perform all services for the Bank of America which Pathways is obligated to perform under the agreement. These services include packaging, selling and promoting tours as well as the performance of other duties related to marketing tours. These services include "accounting, marketing, arranging, booking and other services" for the travel club the Bank of America intends to initiate.[6] *See* Paragraph A of the recitals in the agreement and Paragraph 1.1 of the agreement. Under Paragraph 6.1 the Bank of America agrees to

> advance sufficient funds to PATH-WAYS to pay all of its direct and indirect costs, including without limitation capital costs, legal expenses and properly allocable portions of overhead expenses and interest, incurred with respect to its Travel Club Division. All such costs shall be incurred either pursuant to a budget developed by PATHWAYS and approved by BANK or otherwise with the approval of BANK. All such costs shall be advanced as needed and BANK shall make advances to PATHWAYS against costs anticipated to be incurred, pursuant to the budget agreed upon, as necessary.[7]

6. Under the Bank of America's Pathways Travel Club plan, the bank would operate the club and Pathways would operate the travel agency. Payment of $15.00 to the Bank of America would purchase a membership in the club and would entitle the member, his immediate family and members of his household to the following:
  1) free travelers' checks,
  2) discount on automobile rental,
  3) issuance of BankAmericard if the member is otherwise qualified,
  4) Travel Club magazine issued every two months.
Pathways, not the bank, would set up the tours, take reservations from members, han-

dle promotion, and generally provide the services of a travel agency to club members. Under the agreement of July 30, 1974, the Bank of America has retained ultimate authority to approve the club-related activities of Pathways, including the nature of the tours and of the advertising campaigns used to promote them. The bank's authority over decision making at Pathways gives the bank effective control over all club services, whether provided by the bank or by Pathways.

7. The term BANK in the agreement is a reference to the Bank of America.

Advances paid by the Bank of America to Pathways are repayable only from revenues collected by Pathways and only to the extent these revenues exceed expenses. The advances are made interest-free. In addition the Bank of America has undertaken to pay Pathways $1,000 per month throughout the 13-year term of the agreement. *See* Paragraph 6.4 of the agreement. This $1,000 is intended to compensate Pathways for the monthly payments of $1,000 it is obligated to make to C. Fred Holmes under the agreement. *See* the oral testimony of John J. Nachtrieb, Vice President-Marketing for California Division of the Bank of America.

Paragraph 5 of the agreement is entitled "Indemnification". Under this provision the Bank of America will indemnify all directors and officers of Pathways for

> any and all claims and actions made or brought against [them], whether or not well-founded and irrespective of their ultimate disposition . . . and that directly or indirectly arise from or relate to PATHWAYS entering into this Agreement or its performance of services hereunder . . . .

In short, the agreement assures that the entire risk of losses which may be incurred because of the travel bureau venture will be borne by the Bank of America. Mr. Nachtrieb confirmed this proposition in his oral testimony during the hearing on this motion for a preliminary injunction: Pathways' risk, according to Nachtrieb's testimony, is solely the loss of potential profits.

The Bank of America concedes the correctness of *Arnold Tours, Inc.*, at least for the purpose of this motion, and admits that it may not engage in the travel bureau business. It is conceded, therefore, that the motion for a preliminary injunction would properly be granted if, as in the *Arnold Tours, Inc.* case, the Bank of America had created the Travel Club Division as a department within the existing corporate structure of the Bank of America or if the Bank of America purchased outright a controlling interest in the ownership of Pathways. The Bank of America's position has been that it is not in the travel bureau business, and is not straying from the exercise of "such incidental powers as shall be necessary to carry on the business of banking", as long as any profit generated by the sale of travel services which are not banking-related (e.g., tours, tickets for transportation, reservations, etc.) is entirely for the benefit of Pathways (which the bank maintains is an independent contractor) and as long as the Bank of America receives only profits arising from the sale of traditional banking services (e. g., safe deposit boxes, credit, etc.). The question this Court must answer is whether, considering the contractual arrangement between the Bank of America and Pathways, and considering the language and purpose of the National Bank Act as construed, the Bank of America is conducting a business which is incidental to the business of banking.

The Bank of America's argument identifies profit as the key to whether it is contracting with an independent entity to have certain services performed. The Court knows of no existing standard by which it may determine whether or not a bank is conducting a business within the meaning of 12 U.S.C. § 24 (seventh). While the distribution of profit might have a bearing on this question, and while this factor might even be dispositive under certain circumstances, this Court believes the test of conducting business within the meaning of the National Bank Act must encompass broader considerations.

Through the National Bank Act Congress sought to shelter banking institutions from at least some of the forces of the market which might undermine public confidence in the banks and ultimately threaten their existence. History has taught us the disastrous consequences which follow when banks are weakened and public confidence in them undermined. National banks are denied the opportunity to earn a profit through in-

vesting in ventures unrelated to the business of banking not simply because they might unfairly compete in other industries, but because the pursuit of profit in fields unrelated to banking could tempt bankers to make unwise or improvident decisions and thus could threaten the strength and stability Congress sought to instill in the banking industry. Therefore, in determining whether a bank is in business in violation of 12 U.S.C. § 24 (seventh) we must ask whether the business relationship in which the bank is participating is subjecting the bank to the kinds of risks Congress intended to prevent it from taking. Looking at the relationship between the Bank of America and Pathways in this framework, this Court concludes that the bank's travel club plan is fatally defective under the National Bank Act.

While the Bank of America stands to make no profit directly from the sale of strictly travel-related services (tours, reservations, etc.), nevertheless, as the bank's vice president for marketing conceded, all the risks of loss of funds invested in the venture are borne by the bank. Plaintiffs' Exhibit 2 introduced at the hearing on this motion indicates the bank had invested $968,200 in the venture as of November 8, 1974. Mr. Nachtrieb testified that $1,000,000 was a fair estimate of the investment so far and that the figure will increase as a result of this lawsuit. There is no way to know how high this amount might go because under Paragraph 6.1 of the agreement of June 30, 1974, the bank is committed to "advance sufficient funds to PATHWAYS to pay *all of its direct and indirect costs, including without limitation capital costs, legal expenses*" etc. (emphasis supplied.) While the bank will not profit from the sale of tours etc., Mr. Nachtrieb conceded during his testimony that the bank will not profit from the sale of travel-related banking services unless Pathways is a commercial success. The bank thus assumes all the risks of the non-banking related business without also risking the

possibility of a profit. But it is the danger of the risks that concerned Congress. If Pathways falters, the Bank of America must either prop it up with whatever operating funds (in excess of revenue) are needed under Paragraph 6.1 of the agreement, or the bank must terminate the agreement, also an expensive proposition because of the termination provisions of the agreement. *See* Section 7 beginning at page 12 of the agreement.

Congress wanted to prevent national banks from lending their names to non-banking ventures and from staking their reputations on the success of these ventures. Under the relationship entered between the Bank of America and Pathways, the bank has created both of these conditions. Section 4 of the agreement concerns trademarks and transfers to the Bank of America all right, title and interest in the names "Pathways", "Pacific Pathways" and other names and trademarks associated with Pathways' and the bank's travel operations. The bank therefore has the exclusive right to use the name "Pathways" and other names associated with the travel agency called Pathways, and the first issue of the magazine which will be sent to travel club members (and which will be distributed generally for promotional purposes) is entitled *Pathways*. *See* Exhibit B attached to the Nachtrieb affidavit. On page 35 of the *Pathways* magazine the travel club is described as "A depend-on-us service from Bank of America", and page 36 declares that the club is

Backed by a bank you can depend on.

Millions of people depend on Bank of America to make the most of their money. Now you can depend on us to do the same with your travel.

Under the terms of the travel club plan the bank insures cancellation privileges of members so they can back out of any tour at any time for any reason without risking loss of more than $50. If the cancellation is based on illness in the immediate family, the member will lose

none of his deposit. While these may be excellent terms on which to offer tours and other travel services, they nevertheless create the very dangers the *Investment Company Institute* case tells us Congress wanted to avoid: the reputation of the bank is tied to the successful operation of a business venture which is not incidental to the business of banking.

Because the Bank of America is committed under the contract to cover Pathways' expenses (subject to repayment from earnings) and to indemnify Pathways and its officers and directors from whatever losses they might incur because of their involvement with the travel club, the Bank of America has a substantial interest in the financial success and competent management of Pathways. Pressures exist, therefore, for the Bank of America to risk large advances of funds to Pathways if the venture begins to falter and to lower standards for granting consumer credit for travel expenses to "prime the pump" of the travel industry. The Bank of America's commitment to Pathways creates the same dangers Congress sought to prevent by keeping banks out of the mutual fund business. The threat to the stability of banking institutions and the security of their depositors' and investors' funds is not diminished when banks instead enter the travel business or any venture unrelated to the business of banking and which, unlike the distribution of automobile license plates in Corbett v. Devon Bank, *supra,* is subject to the vicissitudes of the market place.

Whether or not the Bank of America plays a profit-making role in its relationship with Pathways, if the bank assumes the financial risks of the venture and if it otherwise associates with it the bank's name and reputation, then the Bank of America is engaged in the travel bureau business within the meaning of the National Bank Act. The test must not be whether the bank is making a profit from the enterprise, but whether the bank has so closely associated itself with the venture as to create the dangers Congress sought to foreclose with the National Bank Act. Under the facts of this case Plaintiffs have shown a substantial likelihood they will ultimately demonstrate that the Bank of America is engaged in the travel bureau business. Accordingly, it is appropriate that the Bank of America be preliminarily enjoined, pursuant to Rule 65 of the Federal Rules of Civil Procedure, from implementing plans for its travel club as described in the exhibits and testimony before this Court.

■■ Defendants have argued that injunctive relief must be denied because Plaintiffs have failed to show the irreparable harm necessary to justify such relief. The Supreme Court recently held in Sampson v. Murray, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), "that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." 415 U.S. at 90, 94 S.Ct. at 952–953. Plaintiffs here have standing to bring this lawsuit because they will be injured monetarily by increased competition in the travel bureau business. While under Sampson v. Murray this is a compensable injury which ordinarily would not justify injunctive relief, other considerations compel the Court to grant such relief in this case.

In *Arnold Tours, Inc.* the District Court ordered the South Shore National Bank to divest itself of its travel business within six months. 338 F.Supp. at 725. On appeal the court considered the bank's objection that it needed ten years to accomplish such a divestiture "without substantial loss and extreme difficulty." The Court of Appeals rejected the bank's suggestion of ten years but remanded to the District Court for a hearing and decision on a reasonable period to allow the bank to close out its travel activities. It is not denied that Plaintiffs here will suffer substantial economic injury if the Bank of America is permitted to implement its travel club plan. The share of the travel services market the bank should capture, according to its own marketing studies, is not

insubstantial. This injury, along with the extent to which this Court's ability to provide prompt and effective relief will be impaired if the bank proceeds to increase its investment of money and personnel and thus more deeply entrench itself in the travel bureau business, together justify granting injunctive relief while a full trial is pending in this matter. Furthermore, the public policy objections to the bank's involvement in enterprises unrelated to banking concern damage to the bank's reputation and a weakening of the institution through a general undermining of public confidence. These injuries are not compensable at any stage of this proceeding. Accordingly, to prevent these injuries to the public generally and to protect this Court's ability to afford relief to the parties in the future, it is appropriate that preliminary relief be granted at this time.

 The Bank of America has also moved to dismiss the five Plaintiff trade associations (who represent member travel agents) on the ground that these associations can allege no injury caused by the challenged acts of Defendants and therefore lack standing to bring the action. Alameda Conservation Ass'n. v. State of California, 437 F.2d 1087, 1089–1091 (9th Cir. 1971). The Supreme Court held in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), that "an organization whose members are injured may represent those members in a proceeding for judicial review. . . ." 405 U.S. at 739, 92 S.Ct. at 1368. Defendants do not dispute that the members of these Plaintiff trade associations will be injured by the increased competition which would result from the Bank of America and Pathways entering the travel bureau field. In Arnold Tours, Inc. v. Camp, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970), the Supreme Court expressly held that travel agencies would suffer such injury. Since these organizations' members have standing to bring this lawsuit, so do the organizations themselves. United States v. SCRAP, 412 U.S. 669, 687, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). Accordingly, the motion to dismiss will be denied.