[No. 8329–2–III.   Division Three.   July 7, 1988.]

KENNETH K. KNIGHT, ET AL, *Respondents,* v. AMERICAN NATIONAL BANK, ET AL, *Appellants.*

*John Schultz, Leavy, Schultz & Sweeney, Harvey Faurholt,* and *Horton, Wilkins & Faurholt,* for appellants.

*David G. Hancock* and *Smith, Smart, Hancock & Tabler,* for respondents.

GREEN, J.—American National Bank appeals a $415,249 judgment in favor of Grandridge & Deschutes Associates (G & D) for the alleged breach of a commercial lease.

On September 29, 1980, Thomas E. Dunstan and his consulting firm, Mall Centers Intermountain, Inc., executed an earnest money agreement with BNL Development Corporation for the purchase of undeveloped property near Columbia Center in Kennewick. The purchase price was $196,845. In November, Mall Centers Intermountain, Inc., and Messrs. Knight and Cochrane formed a joint venture partnership, G & D, to develop the property. G & D then approached a local group of businessmen who were considering the organization of a bank in the Tri–Cities. G & D proposed the parties enter into a build–to–suit lease on the property. After the promoters of the to–be–formed bank visited the premises and found it to be a suitable location, the property was purchased pursuant to the terms of the earnest money agreement.

On August 28, 1981, following negotiations, E.A. White, a promoter of the to–be–formed American National Bank, entered into a written agreement with G & D entitled "Lease". Under the lease, G & D agreed to construct a building pursuant to plans and specifications to be approved by the bank. Construction was to begin within 30 days after the bank's formation and charter. American National Bank was to occupy the first floor of the 2–story building—60 percent of the available space. The initial term of the lease was 30 years with an option in favor of the bank to purchase the property after the fourth year.

The agreement described Mr. White as "Trustee for American National Bank, a national banking association to be formed". Mr. White signed the lease, "E.A. White,

Chairman". On the date the agreement was executed, the bank was in the process of formation; it had received only preliminary approval from the Comptroller of Currency. The agreement stated Mr. White was not personally liable on the lease, and upon the bank's formation and charter, the lease was to be transferred to American National Bank which would assume the obligations of the lease.

Although American National Bank was originally required by the Comptroller of Currency to raise $2.5 million by the sale of capital stock, this amount was reduced to $1.8 million. The reduced amount was not raised until May 20, 1982. On June 25, the promoters of the bank terminated the lease and after the charter was issued on October 25, 1982, the bank opened for business at a different location. Without the bank's 60 percent occupancy, G & D considered development of the property not to be economically feasible. The property was listed for sale; G & D declined to accept a $236,000 offer and made a counteroffer to sell for $254,000, which was declined. Eventually the property was sold at a sheriff's foreclosure sale. Deficiency judgments were taken. G & D then commenced this action for breach of the lease agreement.

Following a lengthy bench trial that began on October 21, 1985, the court found the bank breached the lease and awarded G & D $150,000 for return of its out–of–pocket investments, and $155,000 damages for "lost profits". The conclusions of law and judgment reduced these amounts to what is stated to be their present value of $298,300. The court also awarded attorney fees in the amount of $85,000 to G & D, plus costs of $31,949. The judgment entered against the bank totaled $415,249. The bank appeals.

Three questions are presented: (1) Did the lease violate the statute of frauds when it failed to include a description of the land or the leased premises? (2) Did the bank adopt or ratify the promoters' lease agreement? (3) Did the court err in its award of damages and attorney fees?

With respect to the first question, the agreement refers to the leased premises as the "American National Bank Building" and describes the property as

the ground floor, mezzanine, Motor Banking facilities and designated parking to be constructed thereon, all of which are situated in the County of Benton, State of Washington, and more particularly described in Exhibit A, attached hereto and by this reference made a part hereof as though set forth fully herein.

The lease also refers to the "Buildings and Improvements to be constructed upon the site plan as set forth in Exhibit B." Neither exhibit A nor B was attached.

The bank contends even though there is no dispute as to the exact property, the lease is void under the statute of frauds. It argues the document does not permit a later attachment of the property description. Additionally, American National Bank asserts the evidence does not support the court's finding the bank had primary responsibility to attach the description. While G & D concedes the lease does not adequately describe the realty, it argues the lease was never intended to stand alone. According to G & D the statute of frauds is satisfied by multiple writings: the lease and the exhibit B site plan, which includes a legal description of the leased premises.

To comply with the statute of frauds, a written memorandum "must embody all essential and material parts of the contemplated lease with sufficient clarity and certainty to indicate the parties' meeting of the minds on all material terms with no material matter left for future agreement or negotiation."[1] *Saunders v. Callaway*, 42 Wn. App. 29, 36, 708 P.2d 652 (1985). Among other material terms, the writing must disclose the subject matter of the contract, *Friedl v. Benson*, 25 Wn. App. 381, 387, 609 P.2d

---

[1]RCW 19.36.010 provides in part: "[A]ny agreement, contract and promise shall be void, unless such agreement, contract or promise, or some note or memorandum thereof, be in writing, and signed by the party to be charged therewith, . . . that is to say: (1) Every agreement that by its terms is not to be performed in one year from the making thereof; . . ."

449 (1980) (quoting *Bharat Overseas Ltd. v. Dulien Steel Prods., Inc.*, 51 Wn.2d 685, 687, 321 P.2d 266 (1958)), and contain a description of the property by lot and block number, addition, city, county and state. *Martin v. Seigel*, 35 Wn.2d 223, 229, 212 P.2d 107, 23 A.L.R.2d 1 (1949). In *Bigelow v. Mood*, 56 Wn.2d 340, 341, 353 P.2d 429 (1960), the court reiterated the long established rule that

> in order to comply with the statute of frauds, a contract or deed for the conveyance of land must contain a description of the land sufficiently definite to locate it without recourse to oral testimony, or else it must contain a reference to another instrument which does contain a sufficient description.

*See also Howell v. Inland Empire Paper Co.*, 28 Wn. App. 494, 495, 624 P.2d 739, *review denied*, 95 Wn.2d 1021 (1981). Compliance with the statute of frauds is not limited to a single, signed piece of paper, but may be evidenced by several documents clearly related. *Alaska Indep. Fishermen's Mktg. Ass'n v. New England Fish Co.*, 15 Wn. App. 154, 158, 548 P.2d 348 (1976). As stated in *Grant v. Auvil*, 39 Wn.2d 722, 724–25, 238 P.2d 393 (1951):

> [T]he note or memorandum may consist of several writings, though the writing containing the requisite terms is unsigned, if it appears from an examination of all the writings that the writing which is signed by the party to be charged was signed with the intention that it referred to the unsigned writing, and that the writings are so connected by internal reference in the signed memorandum to the unsigned one, that they may be said to constitute one paper relating to the contract.

(Italics omitted.)

Here, the lease agreement does not stand alone. It explicitly refers to and incorporates by reference the site plan to be used by G & D and American National Bank in construction of the bank. The site plan is prominently labeled the "American National Bank Building", contains the necessary legal description, and clearly relates to the subject transaction. Thus, parol evidence is not necessary to connect the two writings. The site plan contains the

description of the leased premises by lot and block number, addition, city, county and state. Thus, the court did not err in finding the statute of frauds had been satisfied.[2]

The second question concerns whether the American National Bank adopted or ratified its promoter's lease agreement. The bank contends it never adopted or assumed the agreement. Moreover, it asserts federal banking law prohibits a bank in formation from performing the "business of banking" until the charter is received. Thus, a lease executed prior to the receipt of its charter cannot be binding because the bank cannot ratify an ultra vires act.

■ Although we agree a bank may not ratify an ultra vires act, 1A W. Fletcher, *Private Corporations* § 208 (rev. ed. 1983), we find the promoters or organizers of the American National Bank did not engage in the "business of banking" by executing the lease agreement with G & D. The agreement was necessary as part of its presentation to obtain a charter, *i.e.*, it was required to show where the

---

[2]*In its findings of fact, the court stated:*

5. A representative of the Bank signed the lease on August 28, 1981, in the office of the Bank's attorney. At the time the lease was signed, it was intended that the legal description of the real property to be leased would be attached to the lease in Exhibits "A" and/or "B." At this time, all parties to the lease had sets of the architectural plans for construction of the building (Exhibit "2"), which plans contained a legal description of the subject real property on Sheet 2A. The parties intended that Sheet 2A of these plans would be copied and attached to the lease to constitute Exhibits "A" and "B." The exhibits were not so attached because of an oversight.

6. The primary responsibility for attaching a copy of the legal description to the lease was that of the Bank's attorney. There was no time limit agreed upon for attaching such exhibits.

7. Plaintiffs justifiably expected the exhibits would be attached to the lease as all parties intended and agreed. Good faith and fair dealing now require that such exhibits be attached to provide the required legal description in this lease in accordance with the Statute of Frauds.

8. Defendant failed to raise the Statute of Frauds as a defense in this action until the time of trial and, therefore, waived such defense.

Because we find the statute of frauds satisfied, we need not address whether substantial evidence in the record supports the court's finding that primary responsibility for attaching the legal description was on the bank. A decision may be affirmed on any ground. *Olson v. Scholes,* 17 Wn. App. 383, 391, 563 P.2d 1275 (1977).

bank would be located. The "business of banking" under the national banking act encompasses such activities as receiving deposits, loaning money, paying notes, certifying checks, etc. *See generally M & M Leasing Corp. v. Seattle First Nat'l Bank,* 563 F.2d 1377, 1382 (9th Cir. 1977); *American Soc'y of Travel Agents, Inc. v. Bank of Am. Nat'l Trust & Sav. Ass'n,* 385 F. Supp. 1084 (N.D. Cal. 1974); 12 U.S.C. §§ 24, 26, 27.

While the bank's incorporators did not violate federal banking law by contracting to lease property for its own headquarters, it remains necessary to determine whether the bank adopted or assumed the lease. The agreement recites it was executed by G & D and E.A. White, as trustee for American National Bank, a national banking association *to be formed, as lessee.*[3] It further details:

> It is understood that the Trustee is acting as an accommodation only and is not personally liable on this Lease, and as soon as American National Bank is formed and chartered, meaning fully chartered and including raising the 2.5 million dollars in capital, then this Lease will be transferred and assigned to said Bank which will assume all of the rights and obligations set forth herein. Upon the signing of this agreement by E.A. White, the Bank when chartered as set forth above will be bound by this agreement to use the building site.

The bank contends it is not liable on the lease because prior to the bank's formation and formal charter, its promoters terminated the agreement. The bank contends any vote by the shareholders to adopt the incorporators' acts were intended to include their termination of the preincorporation lease agreement.

The following dates are relevant:

---

[3]The bank argues that only after it became fully chartered and had raised $2.5 million would the lease be transferred and assigned. Although the bank states in its brief that it never obtained $2.5 million in capital and thus implies a condition precedent of the assignment had not been satisfied, we reject this argument since it was because of the bank's own failure to raise the $2.5 million in capital that the Comptroller of Currency permitted this amount to be reduced to $1.8 million.

| July 16, 1981 | First meeting of interim board of directors |
| August 28, 1981 | E.A. White, as trustee, enters into the G & D lease |
| June 25, 1982 | Lease terminated |
| July 29, 1982 | First meeting of bank's shareholders |
| October 25, 1982 | Charter received |

At the July 29 meeting, the following resolution was adopted:

> Upon motion duly made and seconded, the following resolution was adopted by the vote of a majority of outstanding shares entitled to vote. Resolved, that *all contracts, acts* and proceedings of the Interim Board of Directors and Interim Officers since the organization of the association, are hereby ratified and approved.

(Italics ours.) In finding of fact 15, the court found the bank had adopted the incorporators' acts:

> The organizers and directors of American National Bank fully authorized the individual signatories of the lease to execute such lease on behalf of and for American National Bank. Following receipt of its Charter, American National Bank ratified all actions taken by its organizers/directors prior to chartering, including execution of the subject lease, and the termination thereof.

We agree with the court that the resolution adopted all the contracts and acts of the incorporators. The resolution does not exclude the G & D lease agreement. Thus, the resolution included all contracts and acts of the promoters, even though the incorporators had, prior to the first meeting, rejected the agreement. As a consequence, the bank's action approved the promoters' breach of the lease and the damages flowing therefrom are necessarily assumed by the bank.

Third, the bank contends the court erred in its calculation of G & D's damages. The court awarded G & D judgment for $415,249, which included the present value of its lost profits, $155,000, and out–of–pocket investment of

$150,000.[4] Based upon its calculation of a "triple net rental" of $12 per square foot, the court found the "Bank would have exercised the option granted to it in the lease to purchase the building at the end of the fourth year . . ." According to the court, the rental cost was well above market; that, coupled with declining interest rates, the lease's escalation clause and the established occupancy of the second floor, made the bank's purchase of the building a "sound business decision". As a consequence, the court determined the bank unquestionably would have exercised the option to purchase and damages were computed with this in mind.

The court calculated G & D's net profit on the sale of the building to the bank at the end of year 4 to be $155,000 computed as follows:

| | |
|---|---:|
| Purchase price | $1,470,000 |
| Less: | |
| Expenses of sale | 75,000 |
| Payoff of Principal Balance | 1,105,000 |
| Cumulative losses of partnership over initial 4 years | 135,000 |
| Net Profit | $155,000 |

It is the bank's position that G & D did not suffer "lost profits" and thus the court erred in awarding the $155,000. It asserts the court erred in failing to consider the benefits Mr. Knight received by not investing $400,000 required to "internally finance" the building, theoretically over a 30–year term.[5] American National Bank argues there are no lost profits since if the $400,000 had been loaned, G & D would have been obligated to pay $275,854 of interest to Mr. Knight through the time of the sale.

■ Damages for breach of a lease should, as a general rule, reflect a compensation reasonably determined to place

---

[4]The present value of these awards totaled $298,300.

[5]The court found Mr. Knight had the ability and willingness to lend $400,000 of his own funds to G & D at a 14 percent return.

the lessor in the financial position he would have occupied had the breach not occurred. *Pague v. Petroleum Prods., Inc.,* 77 Wn.2d 219, 461 P.2d 317 (1969); *Olson v. Scholes,* 17 Wn. App. 383, 392, 563 P.2d 1275 (1977). The injured party is entitled to the benefit of his bargain, *i.e.,* whatever net gain he would have made under the contract. 11 S. Williston, *Contracts* § 1338 (3d ed. 1968). However, one is not entitled to more than he would have received had the contract been performed. *Platts v. Arney,* 50 Wn.2d 42, 46, 309 P.2d 372 (1957).

We conclude it would be inequitable to grant lost profits under the facts presented.[6] The court's award of $155,000 as lost profits confers upon G & D the total benefit of its bargain without incurring *any* of the risks that flow from obtaining the liability of a loan to construct the building, realization of expected occupancy rates, and other contingencies that could occur during a 30–year lease, including the nonexercise of the option. The building was never built and, thus, none of these risks were incurred.

Moreover, we are not persuaded G & D adequately mitigated its damages. Although the testimony of Mr. Cochrane states the property was initially listed for sale at $260,000 and was subsequently reduced over time to $180,000, there is insufficient explanation in the record to justify G & D's refusal to accept an offer on June 15, 1982, by Tri–Cities Savings and Loan Association to purchase the property for $236,000—an amount exceeding their purchase price from BNL Development Corporation. Had this offer been accepted, there would have been no foreclosure with the resulting deficiency judgments, and perhaps this lengthy, costly litigation. Thus, G & D failed to mitigate its damages.

The bank further contends the court erred in awarding G & D the present value of $150,000 for its out–of–pocket expenses. In granting this amount, the court stated:

---

[6]We thus do not calculate the effect the $400,000 loan and respective interest charge would have had on G & D at the end of 4 years.

After taking into consideration the effect of the Washington Trust foreclosure and the resultant reduction in debt to that lender, the net investment of the Plaintiffs' partnership into this project which was lost as a direct result of the Bank's breach of the lease was $150,000. This sum represents money actually paid out–of–pocket by Plaintiffs and lost as a result of the lease termination.

The trial court was correct in deciding G & D is entitled to damages for its out–of–pocket expenses. However, those expenses must be limited to only those specifically and directly incurred, solely in reliance and in direct relation to, the American National Bank lease agreement. Such damages should place G & D in the same pecuniary position it would have been in had the agreement never been executed. *Platts v. Arney, supra* at 46. Hence, we reverse the present damage award as excessive and remand for redetermination of those specific amounts of damage. By way of illustration, those expenses would include costs actually incurred for arranging financing for the project, fees and expenses actually incurred to engage architectural experts to prepare site plans, and other similar miscellaneous expenses in developing the project.

Finally, the court awarded G & D attorney fees of $85,000 plus costs and expenses of litigation in the amount of $31,949. The court stated:

> Plaintiffs' actual costs of litigation incurred as stated in the Affidavit of David Hancock are reasonable. Plaintiffs' actual attorneys fees incurred as stated in the Affidavit of David Hancock are reasonable and should be awarded. In determining the reasonableness of the attorneys fees to be awarded the Court considered the following factors: (a) The time and labor required of counsel; (b) the novelty and difficulty of the questions involved; (c) the skill requisite to perform the legal services properly; (d) the amount involved and the results obtained; (e) the ability, experience and reputation of counsel for the parties; and (f) the fee customarily charged for similar legal services.

Section 21.01 of the lease provides for the award of reasonable attorney fees and costs to the prevailing party in the

event litigation over the lease arises. Here, as the prevailing party, G & D is entitled to reasonable attorney fees and costs. The amount of those fees is not challenged on appeal. Thus, the award will not be disturbed. G & D is entitled to reasonable attorney fees on appeal; the amount of those fees shall be determined on remand.

Affirmed in part; remanded in part.

THOMPSON, C.J., and MUNSON, J., concur.

Reconsideration denied August 16, 1988.

Review denied by Supreme Court November 29, 1988.