[No. 19897-9-III.    Division Three.    April 25, 2002.]

JOHN HANSEN, *Appellant*, v. TRANSWORLD WIRELESS TV-
SPOKANE, INC., ET AL., *Respondents*.

*David F. Jurca* and *Andrew J. Kinstler* (of *Helsell Fetterman, L.L.P.*), for appellant.

*Meriwether D. Williams* (of *Winston & Cashatt, P.S.*), for respondents.

KATO, J. — In this suit alleging breach of an oral contract, John Hansen appeals summary judgment orders limiting his damages to $5,000 and dismissing his claim of tortious interference against a defendant's corporate parents. On cross appeal, the defendants appeal a jury verdict in Mr. Hansen's favor. We affirm.[1]

Until 1999, Transworld Wireless TV-Spokane, Inc., (TWTV) operated a wireless cable television system in Spokane. TWTV was wholly owned by Wireless Systems, Inc. (WHI). WHI, in turn, was one-third owned by Transworld Telecommunications, Inc. (TTI), and two-thirds owned by Videotron USA, Inc. Videotron USA was wholly owned by Le Groupe Vidéotron Ltée, a Canadian corporation.

In 1998, WHI decided to sell its wireless cable television assets, including TWTV's system in Spokane. WHI engaged Daniels & Associates, L.P., a media broker, to arrange the sale. At the suggestion of François Labonté, WHI's chief financial officer, Mr. Hansen began investigating repurchasing[2] the Spokane assets. On February 26, 1999, Mr. Hansen submitted an offer (through Daniels & Associates) to buy TWTV's assets for $1.25 million.

After some discussion with Mr. Labonté, Mr. Hansen submitted a second offer on March 7, 1999, again for $1.25

---

[1] The evidentiary facts of this case are mostly undisputed. The background facts here are taken primarily from the materials presented to the court on motions for summary judgment.

[2] Mr. Hansen had originally developed the Spokane-based Skyline Entertainment Network beginning in 1990. He had sold those assets to the owners of TWTV in 1994.

million. Mr. Labonté asked for further clarifications, and Mr. Hansen responded with a third offer, again for $1.25 million, dated March 11, 1999 and expressly stating it would expire on March 12. The WHI board of directors met on March 11 and instructed Mr. Labonté to ask Mr. Hansen if he would agree to extend the deadline. Mr. Hansen refused, but said he would reconsider if WHI responded by March 16.

Mr. Hansen did not hear anything until March 25, when he called Guy Beaudry, WHI's president, to see what had happened. Mr. Hansen asked Mr. Beaudry to reconsider his offer, and Mr. Beaudry said he would check with other board members. On April 1, 1999, Mr. Labonté called Mr. Hansen and reportedly said, "We're going to do your deal," and all that was required was a board meeting to approve it. Clerk's Papers (CP) at 246, 438. Mr. Hansen knew Mr. Labonté did not have the authority to sell the assets himself.

The WHI board scheduled a telephonic meeting for April 5, 1999. Coincidentally, Mr. Hansen and Mr. Labonté both were vacationing at Lake Tahoe and met for lunch that same day. Mr. Labonté excused himself for a few minutes to participate in the board meeting. When he returned, he reportedly told Mr. Hansen: "We've approved the deal, it's done." CP at 440. According to Mr. Hansen, Mr. Labonté told him there were two conditions to the board's approval, both of which had already been agreed to by Mr. Hansen. The next day, Mr. Labonté reportedly raised another condition, to which Mr. Hansen also agreed.

Mr. Hansen called Mr. Labonté later that day to ask about the anticipated signed documents. Mr. Labonté testified in a deposition:

Q. And then isn't it correct that at around 4:00 or thereabouts Mr. Hansen called you from Lake Tahoe and asked you where the agreement was?

A. That sounds right.

Q. And isn't it true that the first thing you said to Mr. Hansen after he asked you where the agreement was is, "You're going to be pissed"?

A. Yes.

Q. And at that point isn't it true that Mr. Hansen said to you words to the effect: François, don't say what I think you're going to say?

A. It sounds right.

Q. And that you then advised Mr. Hansen that the company had an expression of interest from another party?

A. Yes.

Q. And do you recall Mr. Hansen then saying to you: François, it's [too] late. [W]e 've got a deal?

A. Yes.

Q. And did you acknowledge that there was a deal?

. . . .

A. I think I said I know.

CP at 170.

On April 9, 1999, Mr. Beaudry reportedly told Mr. Hansen the WHI board had met again and had "withdrawn its acceptance" of Mr. Hansen's offer. CP at 443. On April 30, Sprint Corporation agreed to acquire WHI and all of its assets.

Mr. Hansen filed this action on May 27, 1999, alleging breach of contract by TWTV and its agents and tortious interference with Mr. Hansen's contract rights by TWTV's corporate parents.[3] The defendants moved for partial summary judgment, asking the court to dismiss the tortious interference claims and limit Mr. Hansen's damages on the breach-of-contract claim to $5,000 pursuant to RCW 62A.1-206. The superior court granted both requests.

The matter proceeded to jury trial on the remaining claim of breach of contract. After a six-day trial, the court denied the defendants' motion for judgment as a matter of law. The

---

[3] The complaint also named Sprint as a defendant. The superior court dismissed the claim against Sprint on summary judgment. That order is not being appealed here.

jury found Mr. Hansen and the defendants had formed a contract and the defendants had breached it. The jury awarded the maximum $5,000.

Both sides have appealed.

██ Mr. Hansen contends first that the superior court erred in concluding RCW 62A.1-206 limits his damages to $5,000. On review of a summary judgment order, we engage in the same inquiry as did the superior court. *Our Lady of Lourdes Hosp. v. Franklin County*, 120 Wn.2d 439, 451, 842 P.2d 956 (1993). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). The burden is on the moving party to establish its right to judgment as a matter of law, and facts and reasonable inferences from the facts are considered in favor of the nonmoving party. *Our Lady of Lourdes*, 120 Wn.2d at 452.

██ The Uniform Commercial Code provides that

a contract for the sale of personal property[4] is not enforceable by way of action or defense beyond five thousand dollars in amount or value of remedy unless there is some writing which indicates that a contract for sale has been made between the parties at a defined or stated price, reasonably identifies the subject matter, and is signed by the party against whom enforcement is sought or by his authorized agent.

RCW 62A.1-206(1).

Mr. Hansen contends he satisfied this statute of frauds requirement in two ways. First, he relies on a series of E-mail messages to and from officers, shareholders, and directors of WHI and its corporate parents. A message from Mr. Beaudry (apparently to Videotron directors or shareholders) dated March 11, 1999, stated in part:

---

[4] This provision does not apply to contracts for the sale of goods or securities or to security agreements. RCW 62A.1-206(2).

RECOMMENDATION:

Per Groupe Videotron internal procedure, this note serves to document the recommendation I made to you verbally earlier this week, and with which you agreed, to accept John Hansen's offer (as faxed to Guy Brochu last Monday in his capacity as the other GVL representative on the WHI Board), unless a better offer were received prior to the expiration of Hansen's offer, now set for Friday 3/12 at 5pm Pacific Time.

CP at 343.

A message from Mr. Beaudry to Mr. Labonté, dated March 30, stated:

Find out TODAY how real [Kim] South's interest is in Spokane, or else I will call Hansen to tell him we accept his offer.

CP at 346. The same day, John Campbell (whose corporate capacity is unclear from the record) wrote to Mr. Beaudry:

I called Kim [South] and told her the $3 US million price. She said that she would have to discuss it with her father. I told her that time was of the essence and asked if she wanted your phone number. She said they are not prepared to commit or show interest on such short notice and would call me back if they wanted to pursue the offer.

Given that she cannot give any confirmation of real interest on short notice and you have an offer from Hanson [sic] on the table, you should accept the Hanson [sic] offer. We can continue to keep Kim South as a potential back-up buyer should the Hanson [sic] deal not close. JC

CP at 346. On April 1, André Chagnon (apparently Videotron's principal shareholder) wrote to a corporate officer:

Yes, accept the offer if Spokane is not part of a potential "National roll-out."

CP at 349. Also that day, Mr. Beaudry wrote to the WHI board members:

As you know, we have not received an offer from Hilliard. Furthermore, John Hansen has recently notified me of his interest to reiterate his last $1.25M offer, as it had finally been modified per the WHI board request of Thursday, March 11. I

hereby ask François Ramsay to set up a telephonic board meeting of WHI at the earliest possible time before the end of this week, in order to consider this offer.

CP at 351. Still later that day, Mr. Beaudry wrote to Mr. Chagnon:

Consistent with our e-mail exchanges of the last 48 hourr [sic], and not having been able to develop interest with Kim South from Canada, I will call John Hansen today to tell him we accept his $1.25M offer. I will call Troy D'Ambrosio[5] first to inform him.

CP at 360. Also that day, Mr. Labonté wrote to Mr. Beaudry:

I spoke to John Hansen who would like us to simply amend, if necessary, and sign his Offer to Purchase dated March 11, 1999. I reiterated that we do not want deductions and the system is sold "as is". He wants to do a quick "due diligence" and close May 1. I advised that we still need Board approval which we will obtain no later than close of business Tuesday April 6. He is OK with that and will provide a number where we can fax the offer letter since he will be skiing at Lake Tahoe all of next week.

CP at 354.

As Mr. Hansen points out, the statute of frauds writing requirement may be satisfied by two or more related documents. *See Bharat Overseas Ltd. v. Dulien Steel Prods., Inc.*, 51 Wn.2d 685, 686-87, 321 P.2d 266 (1958) (telegram and cablegram); *Knight v. Am. Nat'l Bank*, 52 Wn. App. 1, 5, 756 P.2d 757 (lease agreement incorporated site plan by reference), *review denied*, 111 Wn.2d 1027 (1988); *Friedl v. Benson*, 25 Wn. App. 381, 388, 609 P.2d 449 (1980) (lease agreement and option to lease); *see also Simplex Supplies, Inc. v. Abhe & Svoboda, Inc.*, 586 N.W.2d 797, 801 (Minn. Ct. App. 1998) (four documents). By requiring only that the writing "reasonably identif[y] the subject matter," RCW 62A.1-206(1), the statute suggests a writing may be sufficient even if it does not contain all the details of the agreement.

---

[5] Mr. D'Ambrosio was a member of WHI's board of directors.

However, the statute expressly requires that the writing "indicate[] that a contract for sale *has been made*." RCW 62A.1-206(1) (emphasis added). The statute thus requires that the writing refer to an already existing oral agreement; an offeree's internal discussions or the parties' continuing negotiations do not satisfy the statute's writing requirement. *See Dairyland Fin. Corp. v. Fed. Intermediate Credit Bank*, 852 F.2d 242, 244-45 (7th Cir. 1988); *Mellencamp v. Riva Music Ltd.*, 698 F. Supp. 1154, 1162-68 (S.D.N.Y. 1988).

Here (even assuming they satisfy the statute's signature requirement), the e-mail messages fail to establish that a contract *had been made*. For a contract to exist, there must be mutual assent, which generally takes the form of offer and acceptance. *Yakima County (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima*, 122 Wn.2d 371, 388, 858 P.2d 245 (1993). There is no valid contract until an offer is accepted. *A.A.B. Elec., Inc. v. Stevenson Pub. Sch. Dist. No. 303*, 5 Wn. App. 887, 889, 491 P.2d 684 (1971). "Failure to reject an offer is not equivalent to assent of that contract since silence is acceptance only where there is a duty to speak." *Saluteen-Maschersky v. Countrywide Funding Corp.*, 105 Wn. App. 846, 853, 22 P.3d 804 (2001).

If there was an acceptance at all, it was not before April 5, 1999, when Mr. Labonté told Mr. Hansen, "We've approved the deal, it's done." CP at 440. That was the first time Mr. Hansen was informed that the WHI board had approved the sale. WHI's silence before that time cannot be considered acceptance, because WHI had no duty to speak. Therefore, because the e-mail messages on which Mr. Hansen relies all related to events *before* the contract was made, they do not establish that a contract *had been made* at the time. At best, the messages are WHI's and Videotron's internal discussions, which cannot satisfy the statute of frauds.

■ Mr. Hansen also relies on what he characterizes as admissions by WHI officers in their depositions that a contract had been made. He urges the court to adopt a

"judicial admissions" exception to RCW 62A.1-206.[6] Our Supreme Court recently has addressed this exception as it applies to contracts involving real property:

> In the statute of frauds context, the judicial admissions doctrine allows courts to enforce oral agreements involving title to real estate as long as the party against whom enforcement is sought has admitted in court or during discovery that an oral agreement existed. Peter J. Shedd, *The Judicial Admissions Exception to the Statute of Frauds in Real Estate Transactions*, 19 REAL EST. L.J. 232, 232 (1991). A broader conception of the exception includes not only admissions that the contract existed but also admissions that the elements of a contract existed while not admitting to the contract itself. *Smith v. Boyd*, 553 A.2d 131, 133 (R.I. 1989). The theory underlying the broader conception is that any admission made in legal documents may constitute a writing sufficient to satisfy the statute of frauds. 2 E. ALLAN FARNSWORTH, CONTRACTS § 6.7, at 147-48 (1998).

*Key Design, Inc. v. Moser*, 138 Wn.2d 875, 884, 983 P.2d 653, 993 P.2d 900 (1999). In *Key Design*, the Supreme Court rejected the exception, at least for real property transactions, in part because the statute of frauds performs a "channeling function" that "helps to create a climate in which parties often regard their agreements as tentative until there is a signed writing." *Key Design*, 138 Wn.2d at 887 (citing RESTATEMENT (SECOND) OF CONTRACTS § 110, at 286 (1981)).

Mr. Hansen urges the court to limit *Key Design* to real estate transactions. However, as Mr. Beaudry's deposition testimony demonstrates, parties negotiating complex agreements involving large amounts of money similarly anticipate that a contract may be made only with a signed writing. The statute of frauds thus performs a similar "channeling function" in those circumstances. We conclude the Legislature rationally chose to omit a "judicial admissions" exception from Article 1-206 because it believed this

---

[6] Another statute of frauds provision of the Uniform Commercial Code expressly incorporates such a "judicial admissions" exception. *See* RCW 62A.2-201(3)(b). The exception was not included in the text of Article 1-206.

"channeling function" was appropriate for sale contracts involving personal property valued at more than $5,000. We therefore decline to apply a "judicial admissions" exception to RCW 62A.1-206.

The superior court properly concluded the statute of frauds applied and properly limited Mr. Hansen's damages to $5,000.

■■■■ Mr. Hansen next contends the court erred in dismissing the tortious interference claim against Videotron USA and Le Groupe Vidéotron. Although neither party has cited Washington authority on the issue, each agrees a corporate parent is not always liable in tort for interfering with the affairs of a subsidiary. *See, e.g., Oxford Furniture Cos. v. Drexel Heritage Furnishings, Inc.*, 984 F.2d 1118, 1126 (11th Cir. 1993) (under Alabama law, parent corporation is not liable if subsidiary is mere adjunct, instrumentality, or *alter ego* of parent); *Deauville Corp. v. Federated Dep't Stores, Inc.*, 756 F.2d 1183, 1196 (5th Cir. 1985) (under Texas law, it is not tortious interference if third party acted to protect its own legitimate interest); *T.P. Leasing Corp. v. Baker Leasing Corp.*, 293 Ark. 166, 171, 732 S.W.2d 480, 483 (1987) (corporation is privileged to interfere with contract relations when contract threatens economic interest of wholly owned subsidiary, unless there is clear evidence of wrongful means or improper purpose).

As Mr. Hansen points out, whether a corporation is entitled to the privilege is a question of fact. *See Deauville*, 756 F.2d at 1197; *but see Oxford Furniture*, 984 F.2d at 1126 (trial court properly concluded parent corporation was not immune and thus submitted question of liability to jury). But dismissal is proper in the absence of a genuine issue of material fact. CR 56(c). A party seeking summary judgment meets its burden under CR 56(c) by demonstrating there is no evidence to support the nonmoving party's case. *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). The burden then shifts to the opposing party to "come forward with evidence sufficient to establish the existence of each essential element of its case." *Howell v. Spokane &*

*Inland Empire Blood Bank*, 117 Wn.2d 619, 625, 818 P.2d 1056 (1991). If the opposing party fails to do so, summary judgment is proper. *Id.*

Here, the defendants presented evidence that, with respect to the events at issue in this case, the financial interests of Le Groupe Videotron, Videotron USA, WHI, TTI, and TWTV were identical. It is overwhelmingly clear that WHI and its corporate parents were attempting to obtain the highest price possible for the TWTV assets. As Mr. Beaudry testified, his duty was to "maximize shareholder value." CP at 211. Although Mr. Hansen argues vaguely that "there are necessarily factual issues concerning the extent of the financial interest alignment between the parent and the partly-owned subsidiary," Reply Br. of Appellant at 47, he has not presented any evidence of such factual issues.[7] In the absence of any such proof, the superior court properly dismissed the tortious interference claim.

■ ■ On cross appeal, the defendants contend first that the trial court erred in denying their motion for judgment as a matter of law because Mr. Hansen agreed any contract must be in writing. On a motion for judgment as a matter of law, the trial court "must accept as true the nonmoving party's evidence and all favorable inferences arising from it." *Stiley v. Block*, 130 Wn.2d 486, 504, 925 P.2d 194 (1996). Denial of the motion "is inappropriate only when it is clear that the evidence and reasonable inferences are insufficient to support the jury's verdict." *Indus. Indem. Co. v. Kallevig*, 114 Wn.2d 907, 916, 792 P.2d 520 (1990). The court on appeal applies the same standard. *Stiley*, 130 Wn.2d at 504.

The defendants rely on two documents. The first is an offering booklet from WHI's broker, Daniels & Associates.

---

[7] Mr. Hansen points out that the authorities on which the defendants rely involved *wholly owned* subsidiaries. While the interests of a hypothetical partly owned subsidiary may be more divergent from its parents' interests than those of a wholly owned subsidiary, it still is incumbent on the party opposing summary judgment to articulate those diverging interests. Mr. Hansen has failed to do so.

The 92-page booklet contains a page labeled "Confidential Memorandum," which states in part:

> Any party considering a transaction to acquire the Company's wireless cable assets agrees to look solely to its own due diligence and any representations, warranties and/or covenants set forth in *a fully-executed, definitive written agreement* relative to the transaction.

Exhibit 78 at 2 (emphasis added).

The second is a confidentiality agreement, signed by Mr. Hansen and a Daniels & Associates representative, providing in part:

> You [Mr. Hansen] understand that although Daniels is acting as a representative of Seller [WHI] Daniels has not nor will it make any representations or warranties as to the accuracy or completeness of the Information. You agree that neither Daniels nor any of its Representatives shall have any liability to you or any of your employees, representatives or affiliates resulting from your or their use of the Information. *Only those representations and warranties that may be made to you in a definitive written agreement, when, as and if executed and subject to such limitations and restrictions as may be specified therein, shall have any legal effect,* and you agree that, if you determine to enter into a transaction with Seller, such determination will be based solely on the terms of such written agreement and on your own investigation, analysis and assessment of the transaction proposed. You agree that the Seller [WHI] has no legal obligation to enter into the proposed transaction with you by virtue of this or any other written or oral expression by it or any of its Representatives, except with respect to the matters specifically agreed to herein.

Ex. 136 at 2-3 (emphasis added).

The defendants contend these two documents conclusively establish that Mr. Hansen agreed WHI would be bound only by a "definitive written agreement." The offering booklet (which Mr. Hansen did not sign) presents the easier of the two issues: It simply does not say what the defendants say it does. In context, the quoted language attempted simply to limit Daniels' and WHI's liability for materials contained in the offering booklet.

■■ The confidentiality memorandum (which Mr. Hansen did sign) presents only slightly more difficulty. It is a contract. The goal of contract interpretation is to determine the intent of the parties. *Tanner Elec. Coop. v. Puget Sound Power & Light*, 128 Wn.2d 656, 674, 911 P.2d 1301 (1996).

> In Washington, the intent of the parties to a particular agreement may be discovered not only from the actual language of the agreement but also from " 'viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties.' " *Scott*[ *Galvanizing, Inc. v. N.W. Enviroservs., Inc.*], 120 Wn.2d [573, ] 580-81[, 844 P.2d 428 (1993)] (quoting *Berg v. Hudesman*, 115 Wn.2d 657, 663, 667, 801 P.2d 222 (1990)).

*Tanner Elec.*, 128 Wn.2d at 674. "If only one reasonable meaning can be ascribed to the agreement when viewed in context, that meaning necessarily reflects the parties' intent; if two or more meanings are reasonable, a question of fact is presented." *Interstate Prod. Credit Ass'n v. MacHugh*, 90 Wn. App. 650, 654, 953 P.2d 812, *review denied*, 136 Wn.2d 1021 (1998).

Here (even without considering the disputed affidavit of the lawyer who drafted the confidentiality agreement for Daniels & Associates, which was not presented during trial), the agreement does not unambiguously preclude Mr. Hansen from relying on unwritten promises. Arguably, in context, it merely required Mr. Hansen to conduct his own "investigation analysis and assessment of the transaction proposed," rather than relying on any representations or warranties that are not contained in a definitive, written agreement. Because this is a reasonable meaning of the quoted language, a question of fact was presented. The trial court thus did not err in denying the defendants' motion for judgment as a matter of law on the basis of the confidentiality agreement.

The defendants also contend the court should have granted their motion for judgment as a matter of law because there was no evidence that they accepted Mr. Hansen's offer or that the terms were sufficiently definite.

An enforceable contract requires mutual assent, which generally takes the form of offer and acceptance. *Yakima County (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima*, 122 Wn.2d 371, 388, 858 P.2d 245 (1993). Whether there was mutual assent normally is a question of fact for the jury. *Sea-Van Invs. Assocs. v. Hamilton*, 125 Wn.2d 120, 126, 881 P.2d 1035 (1994).

The defendants point to various evidence indicating that the WHI board did not approve Mr. Hansen's offer but voted to submit a counteroffer. However, Mr. Hansen testified WHI's officers told him before the April 5, 1999, meeting that the deal was complete, and the board's approval was merely a formality. Mr. Beaudry testified he also considered the approval a formality. Mr. Hansen testified that even before the board's meeting, he agreed to buy the property "as is."

Mr. Hansen and his wife both testified that after the telephonic meeting on April 5, Mr. Labonté said the deal was approved. When Mr. Labonté mentioned two things that needed to be cleared up, Mr. Hansen immediately agreed to accept WHI's positions on both. Accepting this testimony as true and drawing all reasonable inferences from it, we conclude this evidence is sufficient to support findings either that WHI accepted Mr. Hansen's offer or that WHI presented a counteroffer, which Mr. Hansen accepted. *See Excelsior Knitting Mills, Inc. v. Bush*, 38 Wn.2d 876, 879, 233 P.2d 847 (1951) (qualified acceptance is counteroffer, which original offeror may accept).

The defendants also argue the agreement was too indefinite in its specific terms to be enforceable. To be enforceable, a contract must be "definite enough so that when it is coupled with the acceptance it can be determined, with at least a reasonable degree of certainty, what the nature and extent of the obligation is which the proposer has assumed." *Johnson v. Star Iron & Steel Co.*, 9 Wn. App.

202, 206, 511 P.2d 1370 (1973). However, "[e]ven where an agreement might be too indefinite on its terms to be specifically enforced, it may be certain enough to constitute a valid contract, the breach of which may give rise to damages." *McEachern v. Sherwood & Roberts, Inc.*, 36 Wn. App. 576, 579, 675 P.2d 1266, *review denied,* 101 Wn.2d 1010 (1984).

There is no dispute here that the parties had agreed to the most material of the agreement's terms: the price. Mr. Hansen also had agreed to accept the assets "as is." As Mr. Hansen testified, Mr. Labonté told him there were two items that needed to be cleared up, and Mr. Hansen immediately agreed to WHI's terms. This testimony supports an inference that the parties had reached mutual assent to the contract's essential terms. The evidence thus was sufficient for the jury to find there was an oral contract.

The trial court did not err in denying the defendant's motion for judgment as a matter of law.

The judgment is affirmed.

BROWN, C.J., and SWEENEY, J., concur.

Review denied at 148 Wn.2d 1004 (2003).